**In re SIXTEEN TO ONE MINING CORP., a Nevada Corporation, Debtor.**

**ORIGINAL SIXTEEN TO ONE MINE, INC., a California Corporation, Plaintiff,**

v.

**SIXTEEN TO ONE MINING CORP., a Nevada Corporation, Defendant.**

**Bankruptcy No. LV–79–931. Adv. No. 80–0026.**

United States Bankruptcy Court, D. Nevada.

Feb. 12, 1981.

Lionel, Sawyer & Collins, Reno, Nev., for plaintiff.

Mark Hamilton Salyer, Marysville, Cal., for defendant.

Jones & Holt, Las Vegas, Nev., for creditors.

## OPINION AND DECISION

BERT M. GOLDWATER, Bankruptcy Judge.

This is an action by a lessor to have a mining lease declared terminated and not property of the estate of a Chapter 11 debtor. Notice of termination was given by the lessor after the filing of the case for failure to operate the mine both before and after filing for reorganization.

The plaintiff as lessor entered into a mining lease with one Sapp in October 1974, which lease was thereafter assigned with consent of the lessor to debtor defendant. On December 7, 1979, a creditors' involuntary petition under Chapter 11 was filed which resulted in an order for relief on January 14, 1980.

The plaintiff lessor gave debtor notice of default on January 16, 1980 (Exhibit M) with declaration that it would exercise its option to terminate in 30 days unless the defaults alleged were cured. On April 8, 1980, lessor gave notice that the lease was terminated.[1]

The plaintiff relies upon breach of paragraph 4 of the lease relative to operation of the mine.[2] The defendant defends that the

---

1. The lessor served a notice of default August 31, 1977 for failure to perform the lease but seemed satisfied that the lessee was making substantial investments and no termination notice was ever sent. See Exhibits D, E, F, J, and K.

2. Paragraph 4 of the lease provides:

"LESSEES gree [sic] to begin mining operations within one hundred-twenty (120) days from date of this executed agreement. This effort will be comprised of a pilot plant capa-

"rent" has been paid by payment of $25,000 per year minimum royalty as provided in paragraph 6 of the lease on December 31, 1978 and again on December 31, 1979; that acceptance of such payments constitute a waiver of any default as to operation under paragraph 4; that the mine could not operate because a trustee appointed by the Chapter 11 Court refused to allow the debtor to operate; that there is a mill now on the premises capable of handling 225 tons per day and is ready to proceed; that a plan can be presented and the lease performed; that if debtor is in default it is entitled in a plan to accept the lease and cure all defaults [11 U.S.C. § 365(b)(1)].

Plaintiff has not requested relief from the automatic stay of 11 U.S.C. § 362 and gave notice of default and notice of termination without regard to the automatic stay. The plaintiff's theory is that either (a) the lease is not property of the estate since the termination or (b) the lessor is entitled to possession because the lessor does not have adequate protection and, the lease having been terminated, the lessee has no equity and is thus not entitled to use the lease in reorganization.

■ Primarily, when this case was filed on December 7, 1979 an estate was created (11 U.S.C. § 541) and the estate included the debtor's interest in the lease. At that time the lease had not been terminated.

■ Secondly, the automatic stay of Section 362 prevents any act to obtain possession of the property of the estate. [11 U.S.C. § 362(a)(3)] Does this include the giving of notices of default? The answer is

that so long as there is no attempt to obtain possession a notice may be given to alert a debtor lessee of breach of the terms of a lease. A landlord is entitled to put a lessee on notice of where and when the lessee is failing in performance. Otherwise there may be no knowledge of the default which the landlord expects to be cured in the event of assumption of the lease. The giving of a notice in January 1980 that there was a default and describing it is only valid for what it is—notice. The landlord cannot obtain possession without an order of the Court pursuant to 11 U.S.C. § 362(d), or by abandonment, rejection of the lease or stipulation. See 11 U.S.C. § 365(a) and (d)(2). The notice in April 1980 from the landlord attempting to terminate the lease and thereby obtain possession is a nullity.

Paragraph 6 of the lease providing for lease payments states in part:

"6. *CONSIDERATION: LESSEES RECORDS:*

(A) LESSEE shall pay to "OWNER", as rent and royalty for the use and depletion of the claim and the removal of ore from the claim, the sum of 10% of the gross value of said gold, silver and platinum ores sold, minted, smelted or milled, after deducting therefrom any mint charges or smelter and/or refining costs, together with any State or Federal charges, commissions or taxes, now or hereafter imposed by Federal or State Government Authorities of the United States. The "OWNER" reserves the right to receive production in kind in accordance with the above royalty schedule.

ble of milling a minimum of five (5) tons of ore per day. LESSEE further agrees, as rapidly thereafter as conditions permit, and in any event commencing not later than one year from date of this executed agreement, to increase production to a maximum of fifty (50) tons per day and to continue to mine ore from this mine so long as there is ore of acceptable quality, quantity and availability within the claim to permit LESSEE to economically and profitably mine and work the claim. LESSEE agrees to furnish such equipment, tools, machinery and labor as may rea-

sonably be necessary to work the claim and/or mine as is usual and customary in the skillful and proper mining operations of similar character, and shall continue to do so until such time as the use and working of the mine is no longer reasonably profitable to LESSEE, at which time LESSEE shall have the right to cancel this lease by giving ten days' written notice to the "OWNER". Upon termination of this lease LESSEE shall then have the right to remove forthwith any and all equipment, toold, [*sic*] improvements and machinery LESSEE has placed on the claim."

(B) Minimum royalties payable under this lease are $25,000.00 per calendar year starting with calendar year 1978.

As provided for, minimum royalties are due and payable by LESSEE to "OWNER" as follows: $25,000.00 on or before December 31, 1978 and $25,000.00 on or before December 31 of each calendar year while this lease is in full force and effect.

If LESSEE defaults in making said minimum royalty payments in any calendar year, OWNER shall give to LESSEE notice to cure said default within sixty (60) days. If LESSEE fails to cure default during this grace period, OWNER may terminate this lease at its option on thirty (30) days notice in writing, in such event at the expiration of said thirty (30) day notice period, this lease shall be deemed terminated and all rights of LESSEE hereunder shall forthwith cease."

The issues are as follows:

1. Was there a prepetition default and a post petition default as to performance by operation of the mine under paragraph 4 of the lease?

2. Was such operational performance default cured by the landlord's acceptance of the $25,000 minimum annual royalty for 1978 and 1979?

3. Was acceptance of royalty payment in 1978 and 1979 by the landlord a permanent waiver of the requirements of paragraph 4 of the lease?

4. In any event can paragraph 4 be construed as so ambiguous as to make performance impossible?

5. If there has been a default, may the defendant debtor cure that default?

6. Does the lessor have adequate protection until the time for a plan and the acceptance or rejection of the lease?

7. What equity does debtor have in the lease property?

8. Is the lease necessary for an effective reorganization?

The answer to those issues is that:

1. Paragraph 4 of the lease calls for mining operations. There can be no question that there was a failure to conduct mining operations both before and after the filing of this case.

2. Mining leases are a different kind of property lease although the rules governing ordinary leases apply to private mineral leases. In the latter the lessor is primarily interested in the removal of minerals while in the ordinary lease the lessor is chiefly interested in the rent. See 44 Cal.Jur.3d, § 95, p. 455.

In order to provide the mining lease lessor with a return most mineral leases provide for a royalty payment based upon the production of ore. Some leases are considered "alternative" leases, that is, there is a right to remove minerals or, in the alternative, to pay advance royalties with the right to remove minerals in the amount of the advanced royalties. The acceptance of the advance royalties estops the lessor from claiming a default for failure to remove the minerals. See *Van Doren v. Thurber*, 134 P.2d 829 (Cal.1943).

Some leases are the "or" type, that is, to produce or pay rental. In such case were the lessee pays primary rental, there is no right to terminate the lease. *Carroll v. Eaton*, 168 Mont. 150, 541 P.2d 64 (1975).

This lease is one for production with a minimum royalty. The debtor is not relieved of its duty to mine simply by paying the minimum royalty. *Chauvenet v. Person*, 217 Pa. 464, 66 A. 855 (1907).

In absence of operation under paragraph 4 of the lease a showing that the minimum royalty was inadequate requires proof that had the lessee operated there would have been greater royalty. There was no proof as to what the production would have been had the lessee operated. In the absence of such proof, it cannot be determined whether or not the failure to mine would have resulted in greater royalty payments to the lessor. Hence, the minimum royalty payment has not been shown to be inadequate.

There remains, however, a right to terminate for failure to mine. That right must

be weighed in the light of all the facts of the case.

The lease was executed April 12, 1976. Mining operations were to commence within 120 days (paragraph 4). During 1977 there was complete waiver of the requirement by meetings and exchange of letters between the parties. On April 19, 1978, lessor wrote to lessee (Exhibit K):

"First, we were delighted that some of your people were able to attend the meeting and tell the shareholders of the tremendous amount of good work you have done and your plans for the present and future mining operations. The shareholders were impressed with what you have done as we have been all along."

No notices were received from lessor during 1979, but in each of the years 1978 and 1979, lessor accepted $25,000. Then suddenly on January 16, 1980, after this case had been filed, lessor gave lessee notice of default.[3]

The course of conduct of the parties is that where the lessee has shown good faith and paid the minimum royalty there would be no termination but the lessee would be required to commence operation.

■ Notwithstanding that there is a right of termination for failure to mine, the payment of substantial annual sums in 1978 and 1979 of $25,000 each year plus the conduct of the parties discloses an intention to commute the required output of the mine to a minimum rental as an agreed substitute for actual and continuous operation. *Niles Land Co. v. Chemung Iron Co.*, 234 F. 294 (8th Cir. 1916). Since the lessor plaintiff did not asset any forfeiture for 1977, 1978 or 1979 and debtor lessee was unable to operate during 1980 by virtue of this proceeding, it is only fair and proper that it should be insulated from forfeiture under the Bankruptcy Code if it can pay the minimum royalty of $25,000 for 1980 and develop and implement a plan to operate.

The philosophy of the new Bankruptcy Code is to give a "fresh start" and permit defaults under leases to be cured and the lease assumed. See 11 U.S.C. § 365. This is a complete reversal of the philosophy as reflected in the old Bankruptcy Act which provided that an express covenant of forfeiture of a lease was valid against the trustee in bankruptcy. See *Finn v. Meighan*, 325 U.S. 300, 65 S.Ct. 1147, 89 L.Ed. 1624 (1945).

■ 3. Acceptance of minimum royalty payments for 1978, 1979 and 1980 does not nullify the provisions of the lease calling for operation of the mine. The debtor is under a duty to provide in its plan for operation of the mine if it is to assume the lease.

4. While paragraph 4 of the lease is strange in its wording, it may nevertheless be construed as requiring a certain performance. Lessee has already installed a mill capable of 225 tons per day; only a "maximum" of 50 tons per day milling is required. That is not to be construed as either a minimum or a limit; it is without such meaning. The intent is that lessee shall operate and mine so long as there is ore of acceptable quality which can be mined economically and profitably. That is subject to reasonable interpretation. The testimony is that such quality ore exists.

■ 5. The debtor may cure the default by accepting the lease in its plan and commencing production as it can find those things which paragraph 4 requires: quality ore, economically feasible to mine profitably. (11 U.S.C. § 365)

6. The lessor has adequate protection. Both sides claim there is gold in the mine— high grade ore. It is not decreasing in value and many improvements to the mine, roads and equipment show an increase in value to the operation without regard to the integral value of the ore.

7. The debtor has made substantial investment in the mine and has shown that there are interested parties who are willing to undertake performance of the lease and pay more than a million dollars in value.

8. The lease is the debtor's sole property and the basis for its reorganization.

---

**3.** The mine was not operated during 1980 because the trustee appointed at the request of the creditors refused to permit the debtor to operate.

Plaintiff's complaint is dismissed. All counterclaims are dismissed.