The LTV CORPORATION, LTV Steel
Company Inc., and Gulf States
Steel Corporation, Plaintiffs,

v.

GULF STATES STEEL, INC., OF
ALABAMA, Defendant.

Civ. A. No. 91–1072.

United States District Court,
District of Columbia.

Dec. 5, 1991.

Guy Miller Struve, Karen E. Wagner, R. Scott Thompson, Davis Polk & Wardwell, New York City, Jerome G. Snider, Davis Polk & Wardwell, Washington, D.C., for plaintiffs.

Susan G. Braden, Anerson Kill Okick & Oshinsky, Betty Southard Murphy, Baker & Hostetler, Washington, D.C., Richard T. Cunningham, Amer Cunningham Brennan, Akron, Ohio, for defendant.

1. "LTV" refers collectively to the LTV Corporation, LTV Steel Company Inc., and Gulf States

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN H. PRATT, District Judge.

*Background Summary and Procedural Status*

This lengthy litigation commenced with the Order of this Court of August 2, 1984 divesting plaintiff LTV[1] of its ownership of the Gadsden steel mill and the subsequent purchase of Gadsden by defendant Gulf States Steel, Inc., of Alabama ("GSSI") on January 31, 1986. *United States v. LTV Corp.*, Civil Action No. 84–0884 (D.D.C.). The purchase price was covered by a note for $38,500,000. On or about July 17, 1986, LTV filed a voluntary petition for reorganization in the Bankruptcy Court for the Southern District of New York. On November 29, 1987, GSSI filed its proof of claims for LTV's alleged liabilities for environmental violations. From January 31, 1986 to February 1, 1991, GSSI had made all payments due LTV on the note: $9,625,000 principal and $27,907,187 interest, for a total payment of $37,532,187. On February 1, 1991, GSSI declined to make the $4,812,500 payment then due LTV on the note. This adversary proceeding by LTV, as debtor in possession, was immediately initiated to recover the balance due on the note of $31,293,281, plus accrued interest and attorney's fees. Pursuant to defendant GSSI's Motion to Withdraw the Reference to the Bankruptcy Court, Judge Stanton of the Southern District, to whom the matter had been assigned, issued an order Withdrawing the Reference and Transferring the Venue to this Court. *LTV Corp. v. Gulf States Steel, Inc.*, 127 B.R. 107 (S.D.N.Y.1991). In our Order of July 1, 1991, 1991 WL 195327 we denied plaintiff LTV's Motion for Summary Judgment. At the same time we held that defendant GSSI was not precluded from recovery on its claim for recoupment. Pending before us are LTV's claim for the balance due on the note and GSSI's claim (not exceeding the amount

Steel Corporation.

held in escrow pursuant to this Court's Order of June 21, 1991) for the costs it has incurred in correcting environmental violations that arose "directly or indirectly" out of the conduct of Business on or before the closing date which is not an Assumed Liability. *See* January 31, 1986 Agreement of Purchase and Sale of Assets ("Asset Agreement"), Section 9.1(a)(ii).

We held an evidentiary hearing on these issues on August 26 and 27, 1991. Both sides presented live testimony and literally hundreds of exhibits, as well as numerous stipulations.[2] The issues have been extensively briefed.

To summarize the contentions of the parties, it is defendant GSSI's position that plaintiff LTV agreed to be liable for costs incurred in correcting environmental violations arising directly or indirectly out of the conduct of Business on or before January 31, 1986. Plaintiff LTV strenuously disputes defendant's contention and asserts that defendant's expenditures were for the most part not necessary to comply with the environmental requirements in effect on January 31, 1986. Admittedly, defendant from January 31, 1986 to July 31, 1991, has spent over $100,000,000 in capital improvements to an aged and aging steel mill, but, according to plaintiff, such expenditures, however necessary to maintain the plant as a productive and viable entity, were not needed for environmental reasons.

## FINDINGS OF FACT

1. Defendant, GSSI, is a corporation organized and existing under the laws of the State of Alabama with its principal place of business in Gadsden, Alabama. GSSI was organized to own and operate the Gadsden plant, acquired pursuant to this Court's Orders in *United States v. LTV Corp.,* Civil Action No. 84–0884 (D.D.C.).

2. Plaintiff, the LTV Corporation, is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Dallas, Texas. Plaintiff, LTV Steel Company, Inc., is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business in Cleveland, Ohio. Plaintiff, Gulf States Steel Corporation, is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Dallas, Texas. On July 17, 1986, LTV filed a petition for reorganization under 11 U.S.C. § 1101, *et seq.*

3. On August 26, 1991, this Court granted the August 23, 1991 Motion of the Attorney General of the State of Alabama to appear as *amicus curiae* pursuant to its *parens patriae* authority and Ala.Code §§ 22–22A–1 to 16 (1990). Since 1982, the Alabama Department of Environmental Management ("ADEM") has had authority to enforce state environmental laws and administer federally approved or delegated environmental programs.

4. As recognized by Judge Stanton in *LTV Corp. v. Gulf States Steel Inc.,* 127 B.R. 107 (S.D.N.Y.1991), this Court has continuing subject matter jurisdiction, pursuant to the August 2, 1984 Final Judgment and other Orders entered in *United States v. LTV Corp., supra.* This was an action initiated under Section 7 of the Clayton Act, 15 U.S.C. § 18. On May 13, 1991, *LTV Corp. v. Gulf States Steel Inc., supra,* was assigned to this Court as *LTV Corp. v. Gulf States Steel, Inc.,* No. 91–1072 (D.D.C.), and designated as a related case to *United States v. LTV Corp., supra.*

5. GSSI's Gadsden plant is an integrated steel mill, *i.e.,* one that has cokemaking, ironmaking, steelmaking, rolling and finishing processes.

6. Coke is made by heating bituminous coal to remove volatiles leaving a mass of nearly pure carbon that is used as a fuel in the iron and steelmaking processes.

7. At Gadsden, coke is manufactured in two coke batteries, *i.e.,* No. 2 and No. 3, attached to a by-products recovery plant. No. 2 was placed in operation in 1942; No. 3 in 1965. Each battery has 65 ovens;

---

**2.** We are grateful to both sides, particularly the plaintiffs, for reducing the witnesses' direct testimony to writing, introducing said into evidence, and presenting the witnesses for cross-examination. This aided greatly in expediting the hearing.

each oven has two doors. The doors are refractory-faced assemblies placed into jambs. A jamb is an iron casting, held by steel clips that are bolted to vertical steel beams or buck stays, providing the structural framework for the coke oven.

8. After a coke oven is charged by filling it with coal, the temperature is raised by burning gas in the sidewall flues. At GSSI, coal is coked for approximately 24 hours. When coking is complete, the doors are removed and a ram is inserted that pushes the coke from the oven into a quench car that carries it to a tower where it is cooled by water.

9. During coking, approximately 30 percent of the coal's weight is volatized into gases, water vapor and solids that are further processed at GSSI's coke by-products recovery plant. By a series of cooling and chemical processes, various products are then separated, including tars, ammonia sulfate, naphthalene, and benzol. An organic volatile chemical released during these processes is benzene.

10. At each process stage in GSSI's coke by-products recovery plant, wastewater streams are generated. Wastewater streams also are generated at other GSSI processes, including the galvanizing line, where the acid rinse overflow is a major source of zinc found in GSSI's wastewater.

11. At GSSI, iron ore and scrap are refined into steel at the Basic Oxygen Furnace ("BOF") melt shop, where two BOF vessels are located. Scrap and molten iron from the blast furnace are poured into the BOF vessels from transfer ladles causing emission of iron oxide particulates. The molten iron is then desulphurized and slag is skimmed, releasing additional gases and particulates. If these emissions are not captured by the baghouse system, they escape through the monovent (roof monitor). Afterwards, oxygen is blown into the molten iron, creating an exothermic reaction releasing additional gases and particulates that are removed through a water-cooled hood system into an evaporation chamber and then to an electrostatic precipitator. At GSSI, approximately 4 tons of particulates are generated for every heat

of steel produced. GSSI's BOF precipitator, built in 1965, has a shorter residence time for particulate collection and a smaller area of electrodes than is required for standard operation.

12. Compliance with environmental laws and regulations requires compliance with the applicable regulatory standard on a continuous day-to-day basis.

13. Expenditures at the Gadsden plant prior to January 31, 1986, under both Republic and LTV ownership, were inadequate to accomplish environmental compliance. In January 1986, LTV admitted that at least $18–21 million would be required for environmental corrections.

14. From January 31, 1986 to July 31, 1991, in the normal course of business, GSSI had made authorized expenditures of approximately $130 million for capital improvements, including $18,085,438 in correcting environmental violations that arose directly or indirectly out of the conduct of Business at the Gadsden plant prior to January 31, 1986.

15. The foregoing expenditures of $18,085,438 cover repairs in the following categories: coke plant (coke oven doors and jambs, end flue and thru wall and benzene control), BOF/melt shop (fumes suppressor, precipitator and emission control), and water (wastewater treatment plant and galvanizing line).

16. Interest on $18,085,438 as of July 31, 1991, less capitalized interest of $617,924, amounts to $2,371,353.

17. In addition, expenditures in the amount of $10,620,741 have been authorized and are anticipated, but not yet fully incurred, for correcting environmental violations which arose directly or indirectly out of the conduct of Business at the Gadsden plant prior to January 31, 1986. These authorized, but yet not incurred, additional expenditures cover necessary repairs in the end/flue and thru wall, benzene control, and emission control. Defendant's Exhibit ("DX") 5012–1.

18. Anticipated, but not authorized costs are estimated by defendant, as of

July 31, 1991, to be $11,500,000. DX 5004-1.

19. GSSI's operation did not increase the net emissions from the plant. GSSI has significantly increased maintenance expenditures above those made by LTV, particularly at the coke plant and BOF/melt shop.

20. Section 4.9.4(a) of the Alabama Air Pollution Control Rules and Regulations ("Section 4.9.4(a)") provides:

There shall be no visible emissions during the pushing cycle, other than water mist or vapor, within an opacity which is greater than forty percent (40%) for more than one (1) push per hour per battery.

21. Section 4.9.8 of the Alabama Air Pollution Control Rules and Regulations ("Section 4.9.8") provides:

There shall be no visible emissions, other than water mist or vapor, with an opacity greater than twenty percent (20%) from any stack except for a period or periods aggregating not more than three (3) minutes in any consecutive sixty (60) minutes.

22. Section 4.9.6(a) of the Alabama Air Pollution Control Rules and Regulations ("Section 4.9.6(a)") provides:

There shall be no visible emissions, except non-smoking flame, from any opening on the coke oven doors from more than fifteen percent (15%) of the coke oven doors on any battery at any time.

23. The Gadsden plant has a documented history of non-compliance with environmental requirements. As long ago as June 21, 1974, the Environmental Protection Agency ("EPA") reported that the coke plant was not in environmental compliance. Failure to achieve compliance continued to be a concern to EPA in 1975. In order to secure a permit to continue operating No. 2 Coke Battery, Republic promised to shut down and replace this battery by the second half of 1981. Republic reconsidered when it realized $4–$5 million was required to maintain operations until 1981. On March 30, 1976, an abatement order was issued requiring submission of a schedule and costs to achieve compliance by December 31, 1976. Although a September 13, 1976 press release claimed No. 2 Coke Battery had achieved compliance, internal Republic memorandum revealed that, as of December 9, 1976, reported emissions from No. 2 Coke Battery stack were "in violation of Commission regulations." On September 1, 1977, Republic revealed that construction of a replacement for No. 2 Coke Battery would be "indefinitely postponed." On July 17, 1978, a delayed compliance order was issued requiring Republic to "use the best practicable systems of emissions reduction" to minimize violations of Section 4.9.8 (coke oven combustion stacks) on No. 2 Coke Battery by August 1, 1978. Failing to meet this objective, on October 15, 1979, a complaint was filed in Etowah County Circuit Court alleging violations of Section 4.9.4 caused by No. 2 Coke Battery. Republic internal memoranda and correspondence indicated that the defense of the suit would be difficult and No. 2 Coke Battery might have to be closed to settle the litigation. On June 10, 1980, EPA reaffirmed its March 3, 1978 designation, of that portion of Etowah County in which the Republic plant was located, as a non-attainment area, pursuant to Section 107(d) of the Clean Air Act, because it failed to meet the National Ambient Air Quality Standards ("NAAQS"). 45 Fed.Reg. 32,254 (June 10, 1980).

24. Under Republic's ownership, there were numerous violations of the Alabama Pollution Control Rules and Regulations (i.e., Sections 4.9.4(a), 4.9.6, 4.9.8.

25. On June 29, 1984, Republic became a wholly-owned subsidiary of LTV, and thereafter it was required that all environmental licenses be re-issued under the new corporate name, Gulf States Steel Corporation. New air permits were issued on September 13, 1985 covering all process sources of contaminants.

26. Under LTV's ownership, from June 29, 1984 to January 31, 1986, violations of Section 4.9.8 (combustion stacks) were found on at least ten occasions: August 15, 1984; August 28–29, 1984; October 2, 1984; December 5, 1984; January 16, 1985; February 7, 1985; February 22, 1985;

March 14, 1985; and December 17, 27, 30, 1985. In addition, Section 4.9.6(a) violations (door emissions) were cited on October 2, 1984 and February 7, 1985. While the previous consent order did not require Republic either to shut down No. 2 Coke Battery by a specific date or if the NAAQS were not met, nevertheless it remained an enforcement option that could have been required at any time. At a September 21, 1984 ADEM meeting shortly after the final judgment was entered, LTV admitted that the No. 2 Coke Battery:

> ... has more severe problems and its production potential is not predicated to last beyond the end of 1986. Serious problems exist with regard to wall and flue damage that cannot be addressed without major capital expenditures that would be foolhardy on a battery with such a short remaining life.

LTV's Director of Environmental Control also stated that the "No. 2 battery was so far past its useful life that no repairs could be made which would bring the flue stack into compliance." An October 5, 1984 LTV internal memorandum indicated that the No. 3 combustion stack and doors also were not in compliance. On October 31, 1984, LTV wrote ADEM:

> Following ADEM's inspections of August 15 and October 2, 1984 it was determined that major capital must be spent on battery No. 2 in order to bring it into compliance with regard to combustion stack and doors.... With respect to battery No. 3, a similar program of major repair and maintenance is proposed.

A November 1984 internal LTV report confirms that No. 2 was not in compliance.

27. An October 18, 1985 ADEM memorandum summarized LTV's environmental compliance at the Gadsden plant:

> LTV appears to be reluctant to commit to any definite program to achieve long-term compliance of this facility because of the always-imminent sale of the plant, low profitability, and what appears to be a general pattern of poor management aimed at short-term results. Short of legal action, which may threaten continued operation (or sale) of the plant, the Department's options range from tolerating the violations to EPA's involvement, which becomes more likely with time.

The EPA considered the Gadsden plant a "significant violator" since at least October 1984 because of environmental violations regarding the coke batteries.

28. The environmental violations did not immediately cease after GSSI took over Gadsden. On November 8, 1988, ADEM filed a complaint against GSSI in Alabama Circuit Court of Etowah County alleging violations of Section 4.9.4(a) at the coke batteries during August 25, 1987—August 10, 1988. ADEM also cited violations of Section 4.9.4(a) on July 10, 1989; August 23, 1989; September 26, 1989; October 19, 23, 25, 1989; and December 5, 1989. Other violations were also cited in the complaint covering dates as early as October 31, 1986.

29. These violations of Sections 4.9.4(a), 4.9.6(a) and 4.9.8 arose directly or indirectly out of the conduct of Business at the Gadsden plant prior to January 31, 1986.

30. On December 20, 1988, the Alabama Circuit Court entered a consent decree which required extensive end flue and thru wall repairs on the No. 2 Coke Battery, compliance with the regulations relating to pushing on the No. 2 and No. 3 Batteries, and control of emissions from the combustion stacks on said Batteries. A strict time frame for compliance was imposed.

31. GSSI has incurred authorized costs of $5,459,096, as of July 31, 1991, in correcting violations of Sections 4.9.4(a) and 4.9.8 by rebuilding end flues and thru walls to achieve and maintain compliance with Sections 4.9.4(a) and 4.9.8, as required by the consent decree. GSSI completed repairs on 130 end flues on or about December 31, 1990 and is completing remaining end flue and thru walls. DX 5012-1.

32. GSSI will incur additional authorized costs of $540,904 to complete work-in-progress rebuilding end flues and thru walls to achieve and maintain compliance with Sections 4.9.4(a) and 4.9.8, as required by the consent decree. DX 5012-1.

33. By August 1, 1994, GSSI states that it will incur additional costs of approximately $4,500,000 to complete rebuilding end flue and thru walls to achieve and maintain compliance with Sections 4.9.4(a) and 4.9.8, as required by the consent decree. DX 5004-1.

## CONCLUSIONS OF LAW

1. As previously stated, this Court has continuing subject matter jurisdiction pursuant to the Final Judgment and other Orders entered on August 2, 1984 in *United States v. LTV Corp., et al., supra.* This jurisdiction was recognized by Judge Stanton in his Transfer Order of May 3, 1991. (*See* Findings of Fact No. 4.)

2. The Gadsden plant was not in environmental compliance in 1984 at the time LTV and Republic Steel Corporation petitioned this Court to enter the Final Judgment in *United States v. LTV, supra,* and contrary to representations made at that time, therefore was not capable of "competing effectively in the manufacture and sale of carbon and alloy hot and cold rolled sheet steel." Nor was the Gadsden plant capable of achieving and maintaining environmental compliance on a day-to-day basis, on January 31, 1986, without the expenditure of substantial capital.

3. Under the Asset Purchase Agreement of January 31, 1986, defendant LTV had the duty, not only to retain and assume all liabilities or obligations arising directly or indirectly out of the conduct of Business on or before January 31, 1986, but also to indemnify GSSI for such liabilities and obligations. Asset Agreement, Sections 3.1, 3.2 and 9.1. Relevant warranty and representations are set forth in Sections 4.1.5 and 4.1.13.

4. This Court's Orders in *United States v. LTV Corp., supra,* did not relate to, require and were not dependent upon GSSI installing electric furnaces to replace the cokemaking and Basic Oxygen facilities at the Gadsden plant. Electric furnaces cost more to operate and their installation would have an adverse effect upon customers for sheet steel. These two factors would prevent GSSI from being a viable competitor in the domestic steel market.

5. LTV had timely notice, written and otherwise, of GSSI's indemnification claims.

6. Pursuant to this Court's July 1, 1991 Order, GSSI is entitled to receive from LTV authorized costs incurred in correcting violations of environmental laws and regulations that arose directly or indirectly out of the conduct of Business at the Gadsden plant prior to January 31, 1986 in the amount of $18,085,438, by recoupment from the monies deposited in escrow and subject to this Court's June 21, 1991 Order.

7. In addition, GSSI is entitled to receive interest from LTV, on its expenditure of $18,085,438, as of July 31, 1991, less $617,824 capitalized interest, in the amount of $2,371,353, based on an end of the quarter payment convention at a statutory rate of 10 percent per annum, continuing at the rate of $4,786 per day until GSSI has received payment in full, by recoupment from the monies deposited in escrow and subject to this Court's June 21, 1991 Order.

8. Pursuant to this Court's July 1, 1991 Order, GSSI is also entitled to receive from LTV authorized and anticipated costs of $10,620,741 for correcting environmental violations which arose directly or indirectly out of the conduct of Business at the Gadsden plant prior to January 31, 1986.

9. GSSI has not demonstrated, with reasonable certainty, that it will incur authorized costs of approximately $22,120,741 by August 2, 1994 in correcting environmental violations that arose directly or indirectly out of the conduct of Business at the Gadsden plant prior to January 31, 1986. This figure is no more than an estimate of possible future expenditures. Its speculative character is underscored by the fact that in a period of almost six years, these costs have yet to be authorized. At the same time, Gadsden continues to authorize and make substantial capital expenditures to maintain the plant as a viable and effective competitor in the domestic steel market.

An Order consistent with the foregoing has been entered this day.

## ORDER

Pursuant to the Findings of Fact and Conclusions of Law entered this day in the above entitled cause, it is this 5th day of December, 1991

ORDERED that

1. Defendant GSSI's claim for recoupment be granted for the following authorized expenditures made in correcting specific environmental violations which arose directly or indirectly out of the conduct of Business at the Gadsden plant on or before January 31, 1986:

(a) Authorized expenditures of $18,085,-438 plus interest on said amount, as of July 31, 1991, of $2,371,353 (Findings of Fact Nos. 14, 15 and 16, Conclusions of Law Nos. 6 and 7), and

(b) Authorized and anticipated, but not fully incurred expenditures of $10,620,-741 (Findings of Fact No. 17, Conclusions of Law No. 8).

2. Said recoupment shall not exceed the amount held in escrow subject to this Court's Order of June 21, 1991, with respect to the deposit of moneys pursuant to an Escrow Agreement attached to said Order.

3. Plaintiff LTV's claim for any unpaid balance allegedly due on the original purchase money note is denied *without prejudice*, subject to a determination of the amount, if any, presently due LTV on said note.

4. This Court shall retain jurisdiction until any remaining issues are concluded.