The **LTV CORPORATION,**
et al., Appellants,

v.

**GULF STATES STEEL, INC.**
**OF ALABAMA, Appellee.**

No. 92–7001.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 4, 1992.

Decided June 12, 1992.

Rehearing and Rehearing En Banc
Denied July 20, 1992.

Guy Miller Struve, with whom Karen E. Wagner, New York City, and Jerome G. Snider, Washington, D.C., were on the brief, for appellants.

Richard T. Cunningham, Akron, Ohio, with whom Susan G. Braden and Betty Southard Murphy, Washington, D.C., were on the brief, for appellee.

James G. Greilsheimer, New York City, was on the brief for amicus curiae Official Committees of Unsecured Creditors of LTV Corp., et al., urging that the judgment of the District Court be reversed.

Marc Givhan, Montgomery, Ala., was on the brief for amicus curiae State of Ala.

Before WALD, WILLIAMS and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Appellants LTV Corporation, LTV Steel Company, Inc. and Gulf States Steel Corp.

(collectively "LTV") appeal from an order of the district court awarding over $31 million to appellee Gulf States Steel, Inc. of Alabama ("GSSI") as recoupment for expenses incurred in remedying certain environmental violations at a steel mill in Gadsden, Alabama.[1] GSSI purchased the Gadsden plant on January 31, 1986 (the "Closing Date") pursuant to an Agreement of Purchase and Sale of Assets ("Asset Agreement"). The district court interpreted the Asset Agreement to mean that LTV was obligated to pay for all corrective actions to bring the Gadsden plant into compliance with environmental laws to the extent that the conditions to be remedied arose directly or indirectly out of the conduct of the business on or before the Closing Date. After a two-day evidentiary hearing, the court concluded that GSSI was entitled to recoup $31,077,532 in expenses.

Because we conclude that GSSI failed to provide prompt notice to LTV, as explicitly required by the Asset Agreement, of the claims for which GSSI planned to seek indemnification under the Asset Agreement and thereby give LTV an opportunity to challenge or defend against any such claims, GSSI is barred from asserting its rights to indemnification under the Asset Agreement. We therefore reverse.

## I. BACKGROUND

### A. *The Consent Decree*

When LTV agreed to purchase Republic Steel Corp. ("Republic") in September 1983, the Justice Department filed a complaint seeking to enjoin the merger, charging that it would substantially lessen competition in critical parts of the steel industry and tend to create a monopoly in violation of the antitrust laws. A consent decree was signed and approved in August 1984, *see United States v. LTV Corp.*, 1984–2 Trade Cas. (CCH) ¶ 66,133, at 66,334 (1984) ("*Final Judgment*"), *appeal dismissed*, 746 F.2d 51 (D.C.Cir.1984), according to which LTV agreed to divest itself of Republic's steel plant at Gadsden, Alabama. Specifically, the parties agreed that the

[d]ivestiture of Gadsden shall be accomplished in such a way as to ensure that, as of the time of divestiture, it can reasonably be anticipated that Gadsden can and will be operated by the purchaser or purchasers as a viable, ongoing business engaged in the manufacture and sale of carbon and alloy hot and cold rolled sheet steel made from slabs produced at Gadsden or elsewhere.

*Id.* at 66,344.

LTV and the Justice Department also agreed that, should it prove necessary to appoint a trustee to effect the divestiture, the trustee

shall have the power to require the defendants to divest assets only, retaining and assuming all liabilities of Gadsden ... upon [its] divestiture. Defendants shall not object to a sale by the trustee on any grounds other than malfeasance, provided, however, that if the buyer chooses to purchase any inventory or semi-finished or finished steel mill products, coke or raw materials, defendants shall have a right to object....

*Id.* at 66,345.

### B. *The Sale*

As expected, the district court appointed a trustee in December 1984 to effect the divestiture of the Gadsden plant. *See United States v. LTV Corp.*, No. 84–0884 (D.D.C. Dec. 10, 1984). In April 1985, the trustee identified the Brenlin Group ("Brenlin"), a Ohio-based, private holding company, as a possible purchaser. Brenlin submitted a proposed Asset Purchase Agreement as well as a Business Plan to the trustee, and in October 1985, the trustee recommended that the Gadsden plant be divested to Brenlin, on the terms set forth in a revised Asset Purchase Agreement dated September 23, 1985.

The Justice Department submitted a letter to the court in which it stated that it had no objection to and, indeed, supported the sale of the Gadsden plant to Brenlin pursuant to the proposed asset agreement. *See* Letter from J. Robert Kramer, Att'y, Antitrust Division, to Judge Pratt (Nov. 27, 1985). LTV objected to the sale, but after

---

**1.** The Gadsden plant is an "integrated steel mill"—that is, it contains facilities for cokemaking, ironmaking, steelmaking, rolling and finishing processes.

full briefing and oral argument, the district court ordered that the Gadsden plant be sold to the Brenlin Group on the basis of the proposed agreement with "such other modifications as may be agreed to by LTV and Brenlin and approved by the Trustee, and, if material to the viability of Gadsden, by the Department of Justice." *United States v. LTV Corp.*, No. 84–0884 (D.D.C. Dec. 17, 1985) (*"December 17 Order"*) para. 3(f).

After denial of its motion for expedited appeal of the *December 17 Order* on January 7, 1986, LTV sought to enjoin the sale by seeking a temporary restraining order. Subsequently, the court convened another hearing, the trustee intervened, and LTV finally withdrew its motion on January 30, 1986. *See United States v. LTV Corp.,* No. 84–0884 (D.D.C. Jan. 30, 1986). On the next day, LTV agreed to sell the plant to GSSI, a company formed by Brenlin to own and operate the Gadsden plant.

The final version of the Asset Agreement signed on January 31, 1986 included the following provisions:

### 9.1 *Indemnification by LTV.*

(a) From and after the Closing Date, but subject to the conditions and limitations set forth in this Agreement, LTV shall defend, indemnify and save [GSSI] harmless from and against any and all loss, cost, damage or expense (including attorneys' fees) whatsoever resulting from or arising out of (i) any breach of any covenant, obligation or warranty or misrepresentation of LTV contained herein, (ii) any liability or obligation arising directly or indirectly out of the conduct of Business on or before the Closing Date which is not an Assumed Liability. . . .

. . . .

### 9.2 *Indemnification by [GSSI].*

From and after the Closing Date, but subject to the conditions and limitations set forth in this Agreement, [GSSI] shall defend, indemnify and save LTV harmless from and against any and all loss, cost, damage or expense (including attorneys' fees) whatsoever resulting from or arising out of (i) any breach of any cove-

nant or obligation of [GSSI] contained herein, (ii) the Assets or [GSSI]'s use thereof after the Closing Date, . . . and (iv) the conduct of the Business after the Closing Date.

### 9.3 *Claims.*

(a) In the event [GSSI] or LTV (the "Claimant") desires to make a claim against the other (the "Indemnitor") under Section 9.1 or 9.2, the Claimant shall give prompt notice to the Indemnitor of the institution of any actions, suits or proceedings and demands at any time instituted against or made upon Claimant in connection with which the Claimant would claim indemnification under Section 9.1 or 9.2 and Claimant shall, at the time of giving such notice, if the Indemnitor shall agree that it would have responsibility to indemnify under this Section 9.3, give the Indemnitor full authority to defend, adjust, compromise or settle the action, suit, proceeding or demand of which such notice shall have been given, in the name of the Claimant or otherwise as the Indemnitor shall elect. In the event of any claims under Section 9.1 or 9.2 for indemnification, the Claimant shall advise the Indemnitor in writing of the amount and circumstances surrounding said claim. With respect to liquidated claims, if within thirty days the Indemnitor has not contested said claim in writing, the Indemnitor will pay the full amount thereof in cash within ten days after the expiration of such period. . . .

*Id.* §§ 9.1, 9.2, 9.3. The parties agreed that the Asset Agreement would be governed by Ohio law. *Id.* § 13.9.

LTV agreed to accept a $38.5 million unsecured promissory note payable over ten years at an interest rate of 16–¾% per year. The note provided further that an additional 2% would be added to the interest in the event of default. *See* Promissory Note (Jan. 31, 1986) ("Note") preamble. From August 1, 1986 until February 1, 1991, GSSI made regular payments on the Note, with principal and interest payments totalling over $37 million. As of February 1, 1991, GSSI still owed $31,293,000 under the Note.

## C. *The Proceedings Below*

GSSI refused to make any more payments on February 1, 1991, claiming that LTV had failed to comply with the Asset Agreement by refusing to indemnify GSSI for remedial actions taken to correct environmental conditions at the Gadsden plant. LTV considered GSSI to be in default under the Note and brought an adversary proceeding to recover the full amount ($31,-293,000, with interest accruing from February 1, 1991 at a rate of 18¾%) in the bankruptcy court in the Southern District of New York, where it had been in voluntary reorganization since July 1986. Judge Stanton of the district court for the Southern District of New York granted GSSI's motion to withdraw the reference to the bankruptcy court and transferred the case to the district court below. *LTV Corp. v. Gulf States Steel, Inc.*, 127 B.R. 107, 108 (S.D.N.Y.1991).

### 1. Deposit Order

GSSI filed a motion to deposit the outstanding balance on the Note in an escrow account pending resolution of the disputed issues. GSSI's motion was based on Rule 67, according to which a party, in any action for a sum of money, "may deposit with the court all or any part of such sum or thing ... in an interest-bearing account or invested in an interest-bearing instrument approved by the court." FED.R.CIV.P. 67. LTV objected to this request, arguing that the market rate of interest available from an escrow account was insufficient; according to LTV, it was entitled to the default rate (18¾%) under the Note.

After extensive briefing and oral argument on June 14, 1991, the district court granted the motion and ordered that GSSI deposit the outstanding amount owing on the Note into an escrow account. *See* Transcript (D.D.C. June 14, 1991) at 19. In a subsequent order, the district court stated that the deposit of the $31,293,000 (plus 18¾% between February 1 and June 21, 1991) in the escrow account would satisfy any remaining obligation of GSSI to LTV under the Note. *LTV Corp. v. Gulf States Steel, Inc.*, No. 91–1072 (D.D.C. June 21, 1991) (*"Deposit Order"*).

### 2. LTV's Motion for Summary Judgment

In addition to the motion to deposit monies, the district court considered LTV's motion for summary judgment. According to LTV, GSSI had failed to allege that any of the costs it sought to recoup arose from operational events occurring prior to the Closing Date. On July 1, 1991, the district court denied LTV's motion for summary judgment. The court ruled that "[i]ssues of material fact exist as to which, if any, of the corrective actions necessary to bring the Gadsden plant into compliance with environmental law arose 'directly or indirectly out of the conduct of Business on or before the Closing Date which is not an Assumed Liability....'" *LTV Corp. v. Gulf States Steel, Inc.*, No. 91–1072 (D.D.C. July 1, 1991) at 2 (quoting from section 9.1(a)(ii) of the Asset Agreement). The court scheduled an evidentiary hearing for August 26 and 27, 1991.

GSSI filed a motion in limine to exclude the introduction in the hearing of extrinsic evidence relating to the meaning of the indemnity clause. The district court granted GSSI's motion. *See LTV Corp. v. Gulf States Steel, Inc.*, No. 91–1072 (D.D.C. Aug. 22, 1991).

### 3. Findings of Fact and Conclusions of Law

After the evidentiary hearing on August 26 and 27, 1991, the parties submitted proposed findings of fact and conclusions of law. The district court adopted, in the main, the proposed findings and conclusions of GSSI. First, the court concluded that "LTV had timely notice, written and otherwise, of GSSI's indemnification claims." *LTV Corp. v. Gulf States Steel, Inc.*, 133 B.R. 665 (D.D.C.1991) (*"Findings and Conclusions"*) at 14. Second, it found that "[f]rom January 31, 1986 to July 31, 1991, in the normal course of business, GSSI had made authorized expenditures of approximately $130 million for capital improvements, including $18,085,438 in correcting environmental violations that arose directly or indirectly out of the conduct of

Business at the Gadsden plant prior to January 31, 1986." *Id.* at 6–7. Interest on this amount, owing since July 31, 1991, was calculated to be $2,371,353. *Id.* at 7.

Third, the district court concluded that "expenditures in the amount of $10,620,741 have been authorized [by GSSI's board of directors] and are anticipated, but not yet fully incurred, for correcting environmental violations which arose directly or indirectly out of the conduct of Business at the Gadsden plant prior to January 31, 1986." *Id.* The court granted GSSI's claim for recoupment for the total amount of $31,077,532.[2]

## II. DISCUSSION

### A. *Standard of Review*

■ Interpretation of the plain language of a contract is a question of law subject to *de novo* review by this court. *See HOH Co. v. Travelers Indem. Co.*, 903 F.2d 8, 12 n. 6 (D.C.Cir.1990) ("When we have no need to depart from the plain wording of the contracts and no extrinsic evidence is introduced, we are not bound by the clearly erroneous standard of review."); *Washington Metro. Area Transit Auth. v. Mergentime Corp.*, 626 F.2d 959, 961 (D.C.Cir.1980). The district court's post-hearing findings of fact should be reversed only if clearly erroneous. *United States v. Western Elec. Co.*, 900 F.2d 283, 293 (D.C.Cir.) (per curiam), *cert. denied,* —— U.S. ——, 111 S.Ct. 283, 112 L.Ed.2d 238 (1990); *City of Las Vegas v. Lujan*, 891 F.2d 927, 931 (D.C.Cir.1989).

### B. *Environmental Expenditures at Gadsden*

During the evidentiary hearing, the parties stipulated to the fact that GSSI had incurred actual expenditures totaling $18,085,358 through July 1991.[3] In addition, GSSI claimed, and the district court awarded, $10,620,741 corresponding to authorized expenditures for work in progress during 1991 and 1992. *Findings and Conclusions* at 7.

As of July 31, 1991, GSSI had spent (or had committed itself to spend) the following amounts:

**Coke Plant**

| | |
|---|---:|
| (1) Rebuilding brickwork in end flues and through wall of Coke Battery #2 | $ 6,000,000 |
| (2) Installation of 260 coke oven doors and cleaners | $ 2,589,514 |

**BOF/Melt Shop**

| | |
|---|---:|
| (3) Installation of fume suppressor and other emission control devices in Basic Oxygen Furnace ("BOF")/Melt Shop | $ 4,196,566 |
| (4) Repairs to the BOF precipitator | $ 1,493,569 |

**Benzene**

| | |
|---|---:|
| (5) Installation of benzene emission controls at coke byproduct plant | $ 9,000,002 |

**Wastewater Treatment**

| | |
|---|---:|
| (6) Construction of coke byproducts wastewater treatment plant | $ 3,298,063 |
| (7) Construction of galvanizing line wastewater treatment plant | + $ 2,128,385 |
| TOTAL | = $28,706,099 |

---

**2.** The only amount requested by GSSI that the court did *not* award was an additional $11.5 million that GSSI anticipated it would spend "with reasonable certainty" in the future but which had not yet been authorized or committed. The court rejected this request, concluding that "[t]his figure is no more than an estimate of possible future expenditures. Its speculative character is underscored by the fact that in a period of almost six years, these costs have yet to be authorized." *Findings and Conclusions* at 15 (as corrected by *LTV Corp. v. Gulf States Steel, Inc.,* 133 B.R. 665 (D.D.C.1991)).

**3.** There is an $80 discrepancy between the actual amount awarded and the total figure for expenditures included on GSSI's corrected exhibit. *Compare Findings and Conclusions* at 7 ($18,085,438) *with* Defendant's Exhibit ("DX") 5012–1, line 9, col. 5 ($18,085,358).

### 1. Coke Plant

In November 1988, the Alabama Department of Environmental Management ("ADEM") filed a complaint against GSSI, alleging that emissions from the coke plant violated certain sections of the Alabama Air Pollution Control Rules. *Alabama Dep't of Envtl. Mgmt. v. GSSI*, Complaint, No. CV–88–856 (Ala.Cir.Ct. Nov. 8, 1988). One month later, on December 20, 1988, the state court entered a consent order requiring GSSI to make end flue and through wall repairs on the No. 2 coke ovens. *See Finding and Conclusions* at 11–12; *Alabama Dep't of Envtl. Mgmt. v. GSSI*, Consent Order, No. CV 88–856 (Ala. Cir.Ct. Dec. 20, 1988).

### 2. BOF/Melt Shop

The same December 1988 consent order required GSSI to install a fume suppression system on the hot metal transfer station of the BOF. *See id.* at 5. In order to comply with certain sections of the Air Pollution Control Rules, GSSI agreed to carry out extensive repairs on the BOF precipitator. *Id.* at 6.

### 3. Benzene

In September 1989, the EPA issued its Final Rule regarding the National Emission Standard for Hazardous Air Pollutants ("NESHAP"), including the standard for benzene emissions from coke by-products recovery plants. *See* 54 Fed.Reg. 38,044, 38,073–77 (1989). In January 1990, the EPA informed GSSI that it would have to comply with the benzene NESHAP by September 1991. *See* Letter from Winston Smith, EPA, to Ken Means, Chief Engineer, GSSI (Jan. 26, 1990) (DX 386–A); Testimony of John D. Lefler, GSSI Vice–President of Manufacturing (D.D.C. Aug. 26, 1991) at 85. In order to comply with the requirements in the January 1990 letter, GSSI installed a cooling tower, gas blanketing facilities, and mechanical and liquid seals to keep benzene from emanating from containment vessels. *See id.* at 80–81, 177.

### 4. Wastewater Treatment

In June 1986, ADEM issued an administrative order alleging that GSSI was discharging pollutants into a creek near the Gadsden plant in violation of Alabama law. In December 1987, ADEM issued a permit authorizing certain discharge levels in accordance with the National Pollution Discharge Elimination System ("NPDES"). *Id.* at 100–02.

Finally, in an August 1988 administrative order, ADEM required GSSI to submit a pollution abatement plan designed to bring the Gadsden plant into compliance with the December 1987 NPDES permit. *See In re Gulf States Steel, Inc.*, Order No. 88–081–WP (ADEM Aug. 19, 1988). GSSI constructed two wastewater treatment plants—one to remove compounds such as benzene and cyanide from the wastewater of the coke by-products plant and one to remove zinc from the galvanizing line—in order to comply with the August 1988 administrative order.

### C. *Notice*

The district court concluded below that "LTV had timely notice, written and otherwise, of GSSI's indemnification claims." *Findings and Conclusions* at 14. LTV argues on appeal that this conclusion is clearly erroneous, because there is nothing in the record to support the conclusion that it ever received proper notice of (1) the 1988 complaint alleging emissions violations at the coke plant and at the BOF/melt shop; (2) the 1989 benzene NESHAP and the 1990 EPA letter; or (3) the 1988 administrative order requiring compliance with the 1987 NPDES permit concerning wastewater pollutants. Under section 9.3 of the Asset Agreement, GSSI explicitly agreed to

give prompt notice to [LTV] of the institution of any actions, suits or proceed-

ings and demands at any time instituted against or made upon [GSSI] in connection with which [GSSI] would claim indemnification under Section 9.1 or 9.2 and [GSSI] shall, at the time of giving such notice, if [LTV] shall agree that it would have responsibility to indemnify under this section 9.3, give [LTV] full authority to defend, adjust, compromise or settle the action, suit, proceeding or demand of which such notice shall have been given, in the name of [GSSI] or otherwise as [LTV] shall elect. In the event of any claims under Section 9.1 or 9.2 for indemnification, [GSSI] shall advise [LTV] in writing of the amount and circumstances surrounding said claim.

Asset Agreement § 9.3. Clearly, the purpose of this notice provision is to provide LTV with the opportunity to participate in the settling of any claims and the negotiating of any agreements resulting in the expenditure of funds for which it would ultimately be responsible. Of course, LTV could deny responsibility for the costs, but the issue of liability would then be the subject of litigation. The critical point is that GSSI would satisfy its obligations under section 9.3 only by providing notice *prior* to the final settlement of any outstanding claim.

### 1. Ohio Law

■ "The purpose of a requirement of notice and proofs of loss is to allow the insurer to form an intelligent estimate of its rights and liabilities, to afford it an opportunity for investigation, and to prevent fraud and imposition upon it." *West Am. Ins. Co. v. Hardin*, 59 Ohio App.3d 71, 571 N.E.2d 449, 452 (1989). Under Ohio law, a notice provision in an indemnity agreement is considered to be "of the essence of the contract" and is regularly enforced. *Thomas v. Studley*, 59 Ohio App.3d 76, 571 N.E.2d 454, 620 (1989); *Patrick v. Auto-Owners Ins. Co.*, 449 N.E.2d 790, 791, 449 N.E.2d 790 (1982); *Zurich Ins. Co. v. Valley Steel Erectors, Inc.*, 13

Ohio App.2d 41, 233 N.E.2d 597, 598 (1968). Ohio has rejected, however, the traditional view that treats strict compliance with the terms of a notice provision as a condition precedent to the indemnification contract; instead, the failure to comply with the notice provision must cause prejudice to the indemnitor before it is relieved of its obligation to defend or indemnify. *Hardin*, 571 N.E.2d at 452.

■ A provision requiring "prompt" notice to the indemnitor means "notice within a reasonable time in light of all the surrounding facts and circumstances." *Ruby v. Midwestern Indem. Co.*, 40 Ohio St.3d 159, 532 N.E.2d 730, 732 (1988). Whether there has been an unreasonable delay in the giving of notice is generally considered to be a question of fact. *Patrick*, 449 N.E.2d at 791; *Zurich*, 233 N.E.2d at 599. However, courts have on occasion ruled that the time delay was such that notice was not within a reasonable time, as a matter of law. *See, e.g., Patrick*, 449 N.E.2d at 791 (court ruled that claimant's one-year delay in reporting "theft" of car by ex-wife was unreasonable as a matter of law). Under Ohio law, prejudice to the indemnitor is presumed when the delay in giving notice is "unreasonable." This presumption may be rebutted by the presentation of evidence that the indemnitor was not, in fact, prejudiced by the delay. *Ruby*, 532 N.E.2d at 732; *Patrick*, 449 N.E.2d at 791; *see also Imperial Casualty & Indem. v. Buckeye Union Ins. Co.*, No. CA-7989, 1990 WL 41695 at *3, 1990 Ohio App. LEXIS 1420 (Ohio Ct.App. Apr. 9, 1990) at *8 (when notice is unreasonably delayed, burden shifts to claimant to rebut presumption that indemnitor was prejudiced by delay).[4]

### 2. GSSI's Notice to LTV

■ GSSI makes several alternative arguments on the question of notice. First, it argues that it effectively provided notice when it filed its proofs of claim in the

**4.** The Court of Appeals of Ohio recently revisited the issue of burden-shifting when a claimant waited over eight years from the date of the

accident to file a claim against her insurance company.

bankruptcy court. Second, it argues that, because of the automatic stay provision in the Bankruptcy Code, it was precluded from complying with the notice provision. Third, it argues that LTV was not prejudiced by the failure to comply with the notice provision because it had actual notice of the environmental problems at the Gadsden plant and of the nature of GSSI's indemnification claims.

#### a. *Proofs of Claim*

LTV filed for bankruptcy in July 1987, and GSSI filed three separate proofs of claim on November 25, 1987. *See In re Chateaugay Corp.*, Nos. 86 B 11272, 11273, 11291 (Bankr.S.D.N.Y. Nov. 25, 1987). In each claim, GSSI indicated that the amount due was "contingent—unknown" and that the total sum claimed was "undetermined as of this date." The only reference to the "ground of liability" was an attachment—Exhibit C—to each proof of claim, where GSSI indicated that its "contingent claims against Debtor" are based on "contracts, orders, and other instruments applicable to the Debtor." Among those listed was the Asset Agreement, as well as orders entered by the district court in connection with the sale of the Gadsden plant.

Proofs of claim are not intended to be elaborately detailed documents. As one bankruptcy court has explained, "[a] proof of claim for an unsecured creditor requires little more than a listing of name, address, amount of claim (or a listing as "unliquidated" or "contingent"), and a signature. It should take less than five minutes to fill out." *In re Great W. Cities, Inc.*, 88 B.R. 109, 114 (Bankr.N.D.Tex.1988). The proofs of claim submitted to the bankruptcy court made no mention of "the institution of any actions, suits or proceedings and demands at any time instituted against or made upon [GSSI] in connection with which [GSSI] would claim indemnification." Asset Agreement § 9.3. Furthermore, referring only to "contingent claims" and "unknown" amounts, the proofs of claim clearly failed to "advise [LTV] in writing of the amount and circumstances surrounding" the claim as required by section 9.3. *Id.*

In order to comply with the bar date, GSSI had to submit its proofs of claim on or before November 25, 1987, which was prior to any of the regulatory actions of the EPA or ADEM that led to the repairs and improvements at the Gadsden plant. Obviously, the proofs of claim could not, by themselves, satisfy the notice requirement of section 9.3, because the claims for which GSSI seeks indemnification had not yet been made by the time the proofs of claim were presented.

#### b. *Automatic Stay*

■ Anticipating the many problems with its argument that the proofs of claim were sufficient notice under the Asset Agreement, GSSI argues alternatively that it was precluded, by virtue of the automatic stay provision of the Bankruptcy Code, 11 U.S.C. § 362(a) (1988), from providing the notice specifically required.[5] The filing of

---

The implication of the *Ruby* decision is that a delay in giving notice, in and of itself, is not a sufficient reason to deny coverage. Prejudice to the insurer must be demonstrated.

Therefore, the trial court, in the instant cause, erred in stating that the lapse of time between the accident date and the date of notice, in and of itself, was sufficient to defeat the right of appellant to coverage.

*Priester v. Travelers Ins. Co.*, No. 90-T-4426, 1991 WL 45666 at *2, 1991 Ohio App. LEXIS 1394 at *5 (Ohio App. Mar. 29, 1991) (citations omitted). The claimant in *Priester* had presented ample evidence that the insurance company had not been prejudiced by the delay. As the concurring opinion makes clear, once it is demonstrated that notice had been unreasonably delayed, prejudice to the insurer is presumed absent evidence to the contrary. "The burden

of going forward to rebut this presumption rests with the insured. Once the trial court is presented with such evidence, the sufficiency and weight of that evidence becomes the duty and function of the trier of fact." *Id.* 1991 WL 45666 at *3, 1991 Ohio App. LEXIS 1394 at **9–10 (Ford, J., concurring) (citations omitted). The lower court's error in *Priester* occurred not because the burden of presenting the evidence of prejudice was shifted to the claimant; it occurred because the trial judge refused to weigh the evidence once the claimant had presented it.

5. Under the Bankruptcy Code, a petition operates as a stay, applicable to all entities, of—

(1) the commencement or continuation, including the issuance or employment of

bankruptcy stays "[a]ny act to obtain possession of property from the estate," *id.* § 362(a)(3), and courts have interpreted this broadly to encompass such actions as changing the locks in order to effect an eviction, *In re Atlantic Business & Community Corp.*, 901 F.2d 325, 328 (3d Cir. 1990), sending notices of default or of acceleration, *In re Manville Forest Prods. Corp.*, 43 B.R. 293, 298 (Bankr.S.D.N.Y. 1984), *aff'd on relevant grounds*, 60 B.R. 403 (S.D.N.Y.1986), or threatening the termination of a lease, *see In re 48th St. Steakhouse, Inc.*, 835 F.2d 427, 431 (2d Cir.1987), *cert. denied*, 485 U.S. 1035, 108 S.Ct. 1596, 99 L.Ed.2d 910 (1988).

It is clear, however, that "mere requests for payment are not barred absent coercion or harassment by the creditor." *Morgan Guar. Trust Co. v. American Sav. & Loan*, 804 F.2d 1487, 1491 (9th Cir.1986) (presentment of notes for payment was not prohibited by automatic stay), *cert. denied*, 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987); *In re Sixteen to One Mining Corp.*, 9 B.R. 636, 638 (Bankr.D.Nev.1981) ("[S]o long as there is no attempt to obtain possession a notice may be given to alert a debtor lessee of breach of the terms of a lease. A landlord is entitled to put a lessee on notice of where and when the lessee is failing in performance."). The automatic stay is designed to protect the debtor from acts "that immediately or potentially threaten the debtor's possession of its property.... The activities that are specifically prohibited all involve attempts to confiscate the debtor's property or require the debtor to act affirmatively to protect its interests." *Morgan Guaranty*, 804 F.2d at 1491.

Finally, the purpose of the notice provision in the Asset Agreement was to protect the interests of the indemnitor—to allow it "to defend, adjust, compromise or settle the action, suit, proceeding or demand." Asset Agreement § 9.3. Notice would have given the trustee of LTV's estate the opportunity to participate in the fashioning of the 1988 consent order and in negotiating the terms of compliance with the administrative orders and environmental regulations. This would have been entirely consistent with the purposes of the automatic stay provision, for it would have served to protect the interests of the debtor's estate. Neither the language or purpose of the automatic stay provision prevented GSSI from giving notice to LTV under section 9.3.

### 3. Notice by Other Means

█ GSSI argues that, besides the proofs of claim discussed above, support for the conclusion that LTV had notice may be found in the following: (1) depositions of John Steinhauer, Secretary, GSSI, and James S. Van Tiem, Treasurer, GSSI; and (2) two letters, one from Steinhauer to Glenn Moran, LTV Corporate General Counsel on June 6, 1990 and the other from J.F. Powers, LTV Counsel, to Steinhauer on June 7, 1990.

### a. *Depositions*

At his deposition in August 1991, GSSI's Secretary recalled having had certain meetings with representatives from LTV:

A: There was a conversation that I had, which, probably, related to talk about environmental things in probably 1987 when we had Mike Hiemstra [from LTV] and the investment bankers for probably the creditors committee and LTV about discounting the note.

. . . .

---

process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

. . . .

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

. . . .

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title. . . .

11 U.S.C. § 362(a) (1988).

I'm sure environmental matters would have been discussed. The second [meeting] was when we discussed with the union's investment bankers, Lazard Freres, we had a meeting with them in New York, which would probably have been like December of '88 or December of '87, maybe. I think, probably December of '87 we had a conversation with them where financial data was discussed and the state of the company and so forth.

. . . .

Q: What was said about environmental issues?

A: I'm not sure anything was. I can't believe the state of the company could have been talked about without an investment banker asking us about environmental matters.

. . . .

Q: Was anything said about LTV's possible indemnification responsibilities [at the meeting with the investment bankers]?

A: That was not discussed. What we did discuss was because the company had made such a statement about the financial viability of the Gadsden plant, if we were going to get a discount through the bankruptcy, we tried to play up on that financial viability and got into the finances. So that was the hot button.

. . . .

Q: In any of the subsequent meetings in that series with Mr. Hiemstra, was there any discussion about potential indemnification responsibilities as opposed to take our settlement because of this viability issue?

A: We tried to keep it very simple and what we thought would be the best, simplest, cleanest discussion.

. . . .

Q: Prior to 1990 or '91, were there any discussions with LTV about any potential breach of warranties or indemnification?

A: Other than a proof of claim, no.

Transcript of Deposition of John Stuart Steinhauer (Aug. 8, 1991) at 88–91, 106–07, 108.

GSSI's Treasurer testified at his deposition that there were several meetings between representatives from GSSI, LTV, and investment banks in the summer of 1987 to discuss redeeming the promissory Note.

Q: Was there any discussion in connection with any of those meetings or at any of those meetings about the indemnification provision in the asset sales agreement?

A: I don't recall specific discussions about that.

Q: Was there any discussion of environmental liabilities that LTV might have in connection with Gadsden?

A: I don't recall any specific discussions.

Q: Do you recall any general discussions at that time?

A: I don't remember.

. . . .

Q: In those discussions with Shearson and/or First Boston, was there any mention of any indemnification obligation LTV had to Gulf States, or the Brenlin Group?

A: I believe so, but I'm not 100 percent sure.

Q: What do you believe was said by whom?

A: I think there was discussion of environmental issues and general indemnifications made by LTV.

Q: And who said that? First of all, what was said and who said it?

A: I don't recall specifically what was said.

Transcript of Deposition of James D. Van Tiem (Aug. 7, 1991) at 65–67.

The testimony of these two GSSI employees is clearly inadequate to establish that LTV was given notice of the environmental claims against the Gadsden plant. Not only did the purported conversations, like the proofs of claim, predate most of the

relevant regulatory activity, but neither deponent recalled for sure whether environmental issues had even been discussed. Indeed, Steinhauer specifically recalled that the issue of LTV's indemnification was *not* discussed. Van Tiem simply could not recall whether there had been any discussion of indemnification. Contrary to GSSI's assertion, these depositions offer no support whatsoever for the conclusion that LTV had notice of the specific regulatory measures taken against the Gadsden plant and of the specific remedies implemented in response.

#### b. *Letters*

GSSI proposed to satisfy its obligation under the promissory Note by paying LTV $26 million, subject to certain conditions, including:

> An agreement by LTV and its affiliates as debtors and debtors in possession to defend, indemnify, and hold harmless Gulf States from and against any liability or obligation directly or indirectly resulting from or arising out of the conduct of the "Business", as defined in the [Asset Agreement] ..., including, without limitation, employee, tax, environmental, products liability or bulk sales claims, and claims of LTV's creditors as to the validity of title.

Letter from Steinhauer to Moran (June 6, 1990) at 1.

This letter clearly fails to satisfy the requirement of giving "prompt notice to [LTV] of the institution of any actions, suits or proceedings and demands at any time instituted against or made upon [GSSI] in connection with which [GSSI] would claim indemnification," Asset Agreement § 9.3. It refers generally to all "employee, tax, environmental, products liability or bulk sales claims" for which LTV would be responsible under the Asset Agreement, but it does not discuss the nature or amount of any such claims.

In any case, the letter quite obviously comes much too late to satisfy the requirement that LTV be given notice in advance of any settlement or other resolution of outstanding claims. Even if the June 6, 1990 letter had provided the detail required by section 9.3, it would not have given LTV sufficient notice to have allowed it to participate in the negotiation of the December 1988 consent order or in the compliance with either the 1989 EPA benzene regulation or the 1988 administrative order regarding the contamination of the wastewater.

The June 7, 1990 letter consists of only one sentence in which a representative from LTV indicates to GSSI that "LTV has no interest in pursuing the Gulf States settlement proposal." Letter from Powers to Steinhauer (June 7, 1990). At most, this letter proves that LTV received the June 6 letter. But since the notice provided by the June 6 letter was insufficient and untimely, LTV's acknowledgment of it is irrelevant.

#### 4. *Actual Notice*

None of the purported "notices" that GSSI provided LTV—the proofs of claim, the vaguely recalled conversations that took place in 1987, or the letters proposing and acknowledging a settlement offer—satisfied the contractual notice requirement. GSSI's last recourse, then, is to argue that LTV had actual notice of the environmental problems at the Gadsden plant when it submitted its Exhibit "V" to the Asset Agreement[6] and that it was therefore not prejudiced by GSSI's failure to provide notice under section 9.3. Of course, knowledge of the environmental problems at the plant is not the same as knowing about the specific steps taken by the ADEM and the EPA to require remedial action. There is nothing in the record to indicate that LTV had actual notice of (1) the November 1988 complaint alleging violation of emission standards at the coke plant and at the BOF/melt shop; (2) the September 1989 benzene NESHAP or the January 1990 EPA letter setting the date for final compliance; or (3) the December 1987 NPDES permit and the August 1988

---

6. Exhibit "V" is attached to the Asset Agreement and contains a lengthy list of environmental problems of which LTV was aware at the time of the closing. It explicitly states that "LTV makes no representation or warranty that it is in compliance with all environmental laws and regulations applicable to the Business in all material respects." Exhibit V to Asset Agreement.

administrative order requiring the construction of the two wastewater treatment facilities. Furthermore, there is nothing in the record to suggest that GSSI ever informed LTV, prior to defaulting on the Note, that it intended to hold LTV liable for these environmental expenses.

### 5. *Summary*

LTV was prejudiced by GSSI's failure to give notice. In the leading case on notice, the Ohio Supreme Court explained why the failure to provide timely notice in an insurance contract was prejudicial:

> First, [the delay] deprived [the insurer] of any meaningful opportunity to investigate the accident and determine the relative fault of the parties involved; and second, because the deadline for filing claims against the [deceased's] estate had passed, [the insurer] lost any ability to assert a claim against the estate. Thus we find that appellants' failure to provide timely notice was prejudicial to appellee and its right to subrogation.

*Ruby v. Midwestern Indem. Co.,* 40 Ohio St.3d 159, 532 N.E.2d 730, 732 (1988). LTV has been prejudiced in much the same way. In *Ruby,* the claimants delayed notifying their insurance company for only eleven months. In this case, the record reveals that GSSI informed LTV of the extent of its environmental corrections when it filed its statement of costs in anticipation of the evidentiary hearing on July 15, 1991; this was several years after the obligations to make the repairs arose.[7]

Any deficiency in actual evidence to support the conclusion that LTV was, in fact, prejudiced by the failure to provide proper notice is overcome by the presumption in Ohio law arising from GSSI's unreasonable delay in providing notice under section 9.3. GSSI has the burden of rebutting this presumption by coming forward with evidence

that LTV was not prejudiced. *Id.; Patrick v. Auto–Owners Ins. Co.,* 5 Ohio App.3d 118, 449 N.E.2d 790, 791 (1982). There is nothing in the record to indicate that LTV was not prejudiced by the delay, and GSSI has failed to bear its evidentiary burden.

The district court's conclusion that LTV had timely notice of GSSI's indemnification claims was clearly erroneous. The district court adopted the proposed finding of GSSI which purported to rely on the proofs of claim, the conversations in 1987 and the June 1990 letters for evidence that notice was given. But as we have seen, none of these satisfies the plain terms of the notice requirement contained in the Asset Agreement, and LTV was deprived of the opportunity to participate in the defense and settlement of the underlying claims for which it was allegedly responsible. GSSI's failure to give notice precludes its claim for indemnification.[8]

### D. *Interest*

Rule 67 provides that

> [i]n an action in which any part of the relief sought is a judgment for a sum of money … a party, upon notice to every other party, and by leave of court, may deposit with the court all or any part of such sum or thing, whether or not that party claims all or any part of the sum or thing. The party making the deposit shall serve the order permitting deposit on the clerk of the court…. The fund shall be deposited in an interest-bearing account or invested in an interest-bearing instrument approved by the court.

FED.R.CIV.P. 67.

▉ We have found very few cases construing Rule 67. *See* 12 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2991 (1973) (agreeing with prediction that there would not be " 'very many occasions for the application

---

**7.** The fact that the law on notice was developed in the insurance context is significant, for courts may be reluctant to require strict compliance with notice provisions in insurance policies because claimants are often lay people with little understanding of the technical requirements. But where the claimant is a sophisticated corporation that has been well-represented by counsel, this concern about strict applica-

tion of the notice requirement is less compelling.

**8.** Of course, we do not now reach the question of whether LTV would have been liable under the plain terms of the Asset Agreement, had GSSI given proper notice, for the more than $28 million incurred to bring the Gadsden plant into compliance.

of this rule'"). The decision whether to allow a Rule 67 deposit generally lies within the discretion of the district court. *See Gulf States Utilities Co. v. Alabama Power Co.*, 824 F.2d 1465, 1475 (5th Cir.), *modified on other grounds*, 831 F.2d 557 (5th Cir.1987); *In re Department of Energy Stripper Well Exemption Litigation*, 124 F.R.D. 217, 220 (D.Kan.1989). LTV argues that the district court abused its discretion, however, by permitting GSSI to use Rule 67 to deposit the amount owing under the Note and thereby stop the accrual of interest at the default rate of 18¾%.

It is well-settled that Rule 67, like all of the Federal Rules of Civil Procedure, "shall not abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b) (1988). "The Rule 67 procedure provides a place of safekeeping for disputed funds pending the resolution of a legal dispute, but it cannot be used as a means of altering the contractual relationships and legal duties of the parties." *In re Department of Energy Stripper Well Exemption Litigation*, 124 F.R.D. at 218–19; *Prudential Ins. Co. v. BMC Indus.*, 630 F.Supp. 1298, 1300 (S.D.N.Y.1986).

Under the terms of the Note given to LTV by GSSI, "[u]pon the occurrence of any Event of Default [which includes the failure to pay the full amount of any payment of principal] ..., the entire unpaid principal amount hereof and interest accrued thereon shall become immediately due and payable, at the option of the holder." Note § 5(b). Furthermore, "[a]fter maturity, whether by acceleration upon default or otherwise, all sums then due hereunder shall bear interest at the rate set forth above [16¾%] plus Two Percent (2%)." *Id.* preamble. As of June 21, 1991, when the district court signed its *Deposit Order*, GSSI was in default under the Note and was subject to the default rate of interest of 18¾%. On June 21, 1991, the district court ordered that, upon payment of the principal plus interest at the default rate between February 1, 1991 and June 21, 1991, "[a]ny remaining obligation of GSSI to LTV Corporation ... on the January 21, 1986 Promissory Note ... is hereby satisfied and paid in full." *Deposit Order* at 1.

We do not believe, however, that the district court had the authority, under Rule 67, to alter the substantive contractual right of LTV to receive, upon GSSI's default, an 18¾% annual interest rate on the principal amount still owing under the Note. The district court abused its discretion when it effectively altered the terms of the contract by substituting the market rate of interest available in the escrow account for the rate to which the parties had agreed in the Note.

Furthermore the amount currently held in escrow is subject to the default rate of 18¾% rather than to the contract rate of 16¾%. Under Ohio law,

> when money becomes due and payable upon any bond, bill, note, or other instrument of writing ..., the creditor is entitled to interest at the rate of ten per cent per annum, and no more, *unless a written contract provides a different rate of interest in relation to the money that becomes due and payable, in which case the creditor is entitled to interest at the rate provided in that contract.*

Ohio Rev.Code Ann. § 1343.03(A) (Anderson Supp.1991) (emphasis added). A special default rate of interest is permitted under Ohio law.

> [M]oney paid by the borrower to the lender for the use of money after it is past due is regarded as liquidated damages for the detention of the money, and the parties to the lending contract may provide in it for a rate after maturity higher than the rate before, except it must not exceed the limit fixed by the usury statute.

*Hackett v. Kripke*, 62 Ohio App. 89, 23 N.E.2d 438, 438 (1939); *see also Cardinal Fed. Sav. & Loan Ass'n v. Michaels Bldg. Co.*, C.A. No. 12881, slip op. at 4–5, 1987 WL 17783 (Ohio Ct.App. Sept. 30, 1987) (LEXIS, States library, Ohio file) (default rate represented parties' bargained for damages, not unenforceable penalty, where borrower "entered into the agreement, a commercial loan, which clearly included the default rate of interest; indeed, it could be said that the increased default rate provision represented part of the original consideration for which the loan was given").

As of June 21, 1991, when the district court entered its *Deposit Order*, GSSI had been in default for over four months. The obligation under the Note had been accelerated, and the applicable rate of interest under the Note was 18¾%. GSSI chose to litigate the issue of LTV's liability rather than to pay LTV the amount due under the Note and then seek relief as a creditor in bankruptcy court. The risk that GSSI bore in failing to pay LTV the full amount, free and clear of any claims, was that it might lose on appeal and be forced to pay the full amount plus the default rate of interest expressly provided for in the Note. Some risks simply do not pay off.

### III. CONCLUSION

For the reasons stated above, the judgment of the district court is reversed and the case remanded for entry of judgment in favor of LTV for the full amount currently held in escrow plus the difference between the earnings of the escrow fund and the amount of interest that would have been earned at an annual rate of 18-¾% on $31,293,000 between June 21, 1991 and the date of judgment on remand.

*It is so ordered.*