**AM–HAUL CARTING, INC., Plaintiff,**

v.

**CONTRACTORS CASUALTY AND SURETY COMPANY,**
Defendant.

No. 97–CV–5860.

United States District Court,
S.D. New York.

Nov. 13, 1998.

Michael Strauss, for the Defendant/Contractors Casualty.

Kevin Balfe, Jonathan Freiberger, for the Defendant/Seaboard Surety.

TRANSCRIPT OF CIVIL CAUSE FOR BENCH DECISION BEFORE THE HONORABLE LISA MARGARET SMITH UNITED STATES MAGISTRATE JUDGE*

LISA MARGARET SMITH, United States Magistrate Judge.

The plaintiff, Am–Haul Carting, Inc. ("Am–Haul"), filed this action against the defendants under the Miller Act, 40 U.S.C. § 270 *et seq.*, over which this Court has federal question jurisdiction, and raised certain state law claims under the Court's supplemental jurisdiction.

Pursuant to the provisions of Title 28, U.S.C. § 636(c), the parties consented to conduct all proceedings in this case including a bench trial, before me. The action was initially brought to obtain payment due to the plaintiff under a subcontract pursuant to which Am–Haul had carted away construction debris. The construction project under which the subcontract was issued was known as the Stony Lonesome II Project. The general contractor on that construction project was the defendant, Sea Crest Construction Corporation ("Sea Crest"), and the defendants Seaboard Surety Company and St. Paul Fire & Marine Insurance Company acted as sureties for Sea Crest in that construction contract.

In the remainder of this decision I will refer to these three defendants as the Sea Crest parties when I refer to them as a group. Sea Crest had hired an entity named Sovereign Building Corporation ("Sovereign") as a subcontractor on a portion of the Stony Lonesome II Project, and the plaintiff, Am–Haul, then entered into a further subcontract with Sovereign. Contractors Casualty & Surety Company was the surety for Sovereign on the construction project which Sovereign had subcontracted with Sea Crest.

* Editor's Note: This decision has been edited to the extent necessary to conform an oral ruling to the requirements of written publication.

Sovereign subsequently declared bankruptcy and ultimately defaulted on a portion of its payment obligation to Am–Haul. Sovereign also, according to the Sea Crest parties, defaulted on its performance obligations under its subcontract with Sea Crest, assertedly requiring Sea Crest to find a replacement for Sovereign on the project and to expend additional sums beyond those called for in the initial contract with Sovereign to complete the work that Sovereign had been obligated to perform.

Because the project, which involved construction and demolition work at West Point and the nearby Stewart Army Post, was undertaken for the United States Government, it fell under the provisions of the Miller Act, and under that act and the various contracts executed between Sea Crest, Sovereign and their respective sureties, plaintiff Am–Haul was entitled to bring an action against Sea Crest, Sovereign and their sureties to recover any unpaid amount due to Am–Haul under the Sovereign/Am–Haul subcontract. Thus, plaintiff filed this action against the named defendants, although plaintiff did not name Sovereign as a defendant.

The Sea Crest parties, in turn, filed cross-claims, subsequently amended, against Sovereign's surety Contractors. The first set of claims, which are amended cross-claims 1 through 4 that were brought against Contractors by the Sea Crest parties as well as by Sea Crest individually, alleged that Contractors as surety to Sovereign was primarily responsible under Contractor's payment bond obligation, undertaken with Sovereign as principal and Sea Crest as obligee, for all payments due to Am–Haul, and for any and all costs and expenses including attorney's fees incurred by the Sea Crest parties in defending the action against Am–Haul and in pursuit of the Sea Crest parties' cross-claims.

Sea Crest and its sureties asked for a declaratory judgment of the parties' rights as well as an award of damages equal to any sums they were required to pay on account of the Am–Haul action.

The second set of claims, which are amended cross-claims 5 and 6, were brought only by Sea Crest, and alleged first that Contractors was responsible to Sea Crest, under its performance bond executed with Sovereign as principal and Sea Crest as obligee, for paying all additional costs incurred by Sea Crest as a result of Sovereign's default—that is, all costs over and above the price Sea Crest would have been required to pay to Sovereign for the completion of Sovereign's portion of the project.

Second, Sea Crest alleged that Contractors had breached its obligations under the performance bond by failing to take any action to complete Sovereign's work under the subcontract after Sovereign defaulted. Sea Crest asked for a declaratory judgment that Contractors is obligated to complete Sovereign's work under the Sovereign subcontract or to pay to Sea Crest all additional sums over the original contract price associated with Sea Crest's completion of the work called for under the Sovereign subcontract.

The Sea Crest parties, like Am–Haul, did not bring any action against Sovereign.

Just days before this case reached trial, Am–Haul settled its case with the defendants. Although this settlement removed the only federal claim, that is, the Miller Act claim, from the case, thereby permitting this Court to decline to exercise jurisdiction over the remaining supplemental state law claims between the defendants, I chose, in light of the extensive time already invested by the Court and the parties as well as the trial-ready status of the case, to retain jurisdiction over the action and move forward with the remaining claims by the Sea Crest parties against Contractors.

After completion of the bench trial in September, I asked the parties to submit briefs on certain outstanding legal issues raised but not resolved during the trial. I have reviewed the parties' submissions as well as the evidence presented at trial.

The following constitute my findings of fact and conclusions of law:

*Section 1: Basic Background Facts.*

In October of 1995, Sea Crest entered into a construction project known as the Stony Lonesome II Project with the United States Army, for the design and construction of

housing units at West Point and for certain demolition work at the Stewart Army Post. In January of 1996, Sea Crest and Sovereign entered into a subcontract whereby Sovereign was to perform certain of the demolition work at the Stewart portion of that project, also known as the Wherry location.

Pursuant to the terms of the subcontract as noted above, Contractors as surety issued both a payment bond and a performance bond on behalf of Sovereign as principal and in favor of Sea Crest as obligee, each in the amount of $850,000.00. The payment bond was for the use and benefit of claimants, a claimant being defined, inter alia, as an entity "having a direct contract with Sovereign for labor, material, or both used or reasonably required for use in the performance of the contract."

The purpose of the payment bond was to bind the surety, Contractors, as well as the principal, Sovereign, for the payment of any amounts owed but not paid by Sovereign to its subcontractors. The bond specifically provided that claimants could sue under the bond and that Sea Crest "shall not be liable for the payment of any costs or expenses of any such suit."

Sea Crest required such a bond from Sovereign to ensure that Sea Crest would not be liable for the payment of any sums owed by Sovereign or for the costs of defending a suit based on such sums should Sovereign default on its payment obligations.

The separate performance bond entered into by Contractors provided in part that whenever the contractor, Sovereign, "shall be and declared by the owner, Sea Crest, to be in default under the contract, the owner having performed owner's obligations thereunder, the surety may promptly remedy the default or shall promptly, one, complete the contract in accordance with its terms and conditions, or, two, obtain a bid or bids for completing the contract, and upon determination of the lowest bidder arrange for a contract between such bidder and owner, and make available as work progresses sufficient funds to pay the cost of completion less the balance of the contract price, but not exceeding, including other costs and damages for which the surety may be liable hereunder, the amount of [$850,000.00]."

The term "balance of the contract price" as used in this paragraph of the performance bond, is defined as "the total amount payable by owner to contractor under the contract and any amendments thereto, less the amount properly paid by owner to contractor."

In May of 1997, Sovereign filed a Chapter 11 bankruptcy petition, but Sea Crest was not notified of this action at that time. Although Anthony Frascone, Sovereign's principal, testified that he did communicate with a principal of Sea Crest about this issue, I found much of Mr. Frascone's testimony to lack credibility and I do not accept his assertion on this particular point.

On August 26, 1997, Sea Crest sent a pre-default letter by certified mail to Sovereign, with a copy to Contractors, warning that a declaration of default was imminent if certain work was not immediately completed. On September 5, 1997, Sea Crest sent another letter by certified mail to Sovereign advising that Sovereign was declared in default and that the Sovereign subcontract "is hereby terminated." Sea Crest also sent a copy of the September 5th default letter to Contractors, with a cover letter notifying Contractors that Sea Crest expected Contractors to fulfill its obligation under the performance bond, and that in light of Contractors' lack of response to the prior notice, Sea Crest was proceeding to secure others to perform Sovereign's work.

I credit the testimony of Sea Crest's representatives that they had no knowledge of the bankruptcy proceedings at the time of sending these letters. Contractors did not respond in any way to this notification until December of 1997, three months after Sovereign was declared in default and after this lawsuit was initiated by Am–Haul, at which time Contractors, by its counsel, asked Sea Crest to provide additional factual information pertaining to the default-a request that was, on the advice of counsel, referred to the attorneys retained to represent Sea Crest in this action.

By that time, Sea Crest had moved into the void created by Sovereign's lack of performance and Contractors' failure to respond to the default notification, and had hired new subcontractors to complete the work left unfinished by Sovereign. The Sea Crest parties then filed their cross-claims against Contractors for payment of sums due to Am-Haul under the payment bond, for reimbursement of costs and expenses including attorney's fees in the defense of the Am-Haul action, and for performance and/or payment of damages as required by the performance bond. Contractors responded with denials and a series of 17 affirmative defenses, a number of which it dismissed prior to the trial but a number of which it has pursued in this trial and in the legal briefs submitted at the conclusion of trial.

I will present further findings of fact pertinent to each of these defenses as well as my conclusions of law in regard to each of them as we go forward.

■ First, I must address a threshold issue, which is, does Section 362 of the Bankruptcy Code, known as the automatic stay provision, prohibit or nullify Sea Crest's default and termination letter to Sovereign and therefore prevent the triggering of Contractors' obligations under the bond?

Contractors asserts that, as a threshold issue, Sea Crest has not properly declared Sovereign to be in default as required in order to trigger Contractors obligations under the performance bond and that, therefore, Sea Crest cannot make a claim under that bond.

Contractors' argument rests upon the impact that Sovereign's bankruptcy, and certain sections of the Bankruptcy Code relating to it, allegedly have upon Sea Crest's declaration of default and Contractors' obligations. As Contractors points out, Title 11, U.S.C. § 362, the so-called automatic stay provision of the Bankruptcy Code, provides that the filing of a bankruptcy petition, such as the one filed in May of 1997 by Sovereign, automatically stays any act to obtain possession of property belonging to the debtor's estate.

Contractors argues that Sea Crest's September 5th letter, which declared Sovereign in default and also purported to terminate the subcontract between Sovereign and Sea Crest, but which was issued without seeking relief from the automatic stay, violated this provision of the Bankruptcy Code. Contractors further argue that the termination is therefore void. On these grounds, Contractors asks this Court to conclude that Sea Crest's September 5, 1997, declaration of default against Sovereign is fatally flawed, that the declaration of default is in itself a violation of Section 362, and that the September 5th letter, therefore, did not successfully trigger Contractors' obligations under the bond.

After careful consideration, I disagree with Contractors' position. To begin with, as noted in the factual summary above, the performance bond requires simply that Sovereign shall be and declared by Sea Crest to be in default under the contract in order for Contractors' obligations to be triggered. Sea Crest, by notifying Sovereign and Contractors of Sovereign's default, satisfied the declaration requirement. To the extent that Contractors has argued that Sovereign was not actually in default, I find as a matter of fact that Sea Crest has fulfilled its burden of proof on this point and has established default by Sovereign.

Anthony Frascone, the principal of Sovereign, conceded on the stand that between July 25, 1997, when he received a copy of the punch list notifying him of more than 25 items requiring completion by mid-September, and September 5, 1997, when the default letter arrived, he had completed no more than four of the items on the list, despite the fact that Sovereign had received the August 26th pre-default letter notifying it and Contractors that a declaration of default was imminent. Frascone also made no claim during his testimony of having taken any steps to remedy the pre-default or even the default situations described in Sea Crest's letters to it.

Therefore, to the extent that Contractors has argued that the notification letter itself, either by its notification of default or by its notification of termination, actually caused the default, I find that such was not the case. As a matter of fact, I find that Sovereign's

default caused Sea Crest to send the letter, not the other way around.

■ There are two separate legal issues with regard to the automatic stay provision: first, whether it was permissible for Sea Crest to unilaterally terminate the contract with Sovereign, and second, whether there was any flaw in Sea Crest's notification of default for purposes of triggering Contractors' bond obligations. The starting point in this analysis, and the over-arching principle guiding any decision on these points, is that, as the Ninth Circuit Bankruptcy Appellate Panel has declared, "The automatic stay of Section 362(a) protects only the debtor, property of the debtor or property of the estate, not non-debtor parties or their property. Thus, Section 362(a) does not stay actions against guarantors or sureties." *Advanced Ribbons & Office Products, Inc.*, 125 B.R. 259, 263 (9th Cir. Bankruptcy Appellate Panel, 1991).

■ Thus, even if one were to assume that termination of the contract by Sea Crest would violate the automatic stay with regard to the debtor Sovereign, the appropriate remedy would be to void the termination as against Sovereign. *See, e.g., In re 48th Street Steakhouse, Inc.*, 835 F.2d 427, 431 (2nd Cir.1987) ("Actions taken in violation of the stay are void and without effect"), *cert. denied*, 485 U.S. 1035, 108 S.Ct. 1596, 99 L.Ed.2d 910 (1988).

■ Even if the termination were held to be invalid, there is no reason to conclude that voiding the termination against Sovereign would have any impact whatsoever on Contractors, both because the stay as noted above was not intended to protect the surety, and because questions of termination play no part in triggering the surety's obligations under the bond contract. Voiding the statement of termination would leave untouched the fact and the declaration of default. It is that declaration of default, and not the termination of the contract, which triggered Contractors' obligations under the bond. As to whether this declaration of default in and of itself violated the automatic stay provision, both precedent and logic dictate that it did not.

In *In re Sixteen to One Mining Corporation*, 9 B.R. 636 (Bankr.D.Nevada, 1981), the Court explained "The automatic stay of Section 362 prevents any act to obtain possession of the property of the estate. Does this include the giving of notices of default? The answer is that so long as there is no attempt to obtain possession a notice may be given to alert a debtor of breach. A party to a contract is entitled to put the other party on notice of where and when that other party is failing in performance. Otherwise, there may be no knowledge of the default which the complaining party expects to be cured in the event of [in that case] assumption of the lease. The giving of a notice that there was a default and describing it is only valid for what it is-notice." *Id.*, 9 B.R. at 638 (finding the notice of default valid as notice but nullifying the complaining party's attempt to terminate the lease and thereby obtain possession of the property).

In the case before us there has been no attempt by Sea Crest to obtain possession of the property of the debtor. In addition, Sea Crest made no further claim against Sovereign, commenced no judicial proceeding against it, and took no further action of any kind against Sovereign that would cause any detriment to the estate. Indeed, Sea Crest has maintained and protected a quantity of funds on Sovereign's behalf. There is no reason why the default notice should be prohibited.

The fact that a notice of termination was mentioned in the same letter as that containing the default notification does not alter this result. In fact, as Contractors has argued in its own brief, a statement by the obligee, in this case Sea Crest, that it considers the subcontract to be terminated is considered by some courts to be an essential element of a default notification claim that is intended to invoke a surety's obligations under a bond. *See, e.g., L & A Contracting Company v. Southern Concrete Services, Incorporated*, 17 F.3d 106, 111 (5th Cir.1994).

For Contractors to argue on the one hand that a mention of termination by the obligee may be required to invoke the surety's obligation, but on the other hand that such mention of termination violates the automatic

stay and thereby precludes the obligee from making a claim against the surety, is to create an absurd catch–22 situation that would undermine the very purposes for which general contractors require the posting of performance bonds in the first place. Failure to perform by a subcontractor is often accompanied by a bankruptcy proceeding. To prohibit enforcement of performance bonds in those situations, or to require the obligee to enter into formal litigation to lift the bankruptcy stay against the debtor in order to trigger the contractual obligations of the surety, would subject the contractor obligee to precisely the needless cost and delay that it contracted to avoid, and would fly in the face of the principle that the stay protects only the debtor, not the surety.

■ Thus, I conclude that Sea Crest's default notification letter was sufficient to trigger Contractors' obligations under the performance bond. In addition, to the extent that Contractors argues that the default notification was unjustified because Sovereign had substantially performed its obligations, and that therefore Sea Crest's notification constituted a breach of the subcontract and of the bond's requirement that Sea Crest have performed its obligations under the subcontract before default can be properly declared, I reject that argument as well, and I find that there is no basis for concluding that Sea Crest's notification breached the contract or that the default notification was flawed.

Having determined that Contractors' obligations were triggered as of September 5, 1997, and having concluded that Contractors failed to complete those obligations in any way, I declare Contractors in breach of its contract under the performance bond. The issues that remain are whether any other intervening factor altered Contractors' obligations under the bond and, if not, what remedy is appropriate.

*Section 2: Material Alteration.*

Contractors also argues that the Sovereign subcontract, and therefore Contractors' surety obligations under the performance bond, were so materially altered by a change order for blasting work at West Point that added $250,000.00 to Sovereign's contract, that Contractors was thereby discharged from its obligations under the performance bond. This argument is flawed for a number of reasons.

■ First, Contractors argues, and presents case law to support the proposition, that a surety may be discharged from performance under a bond where the surety's undertaking has been materially altered without its consent. However, it is clear that Contractors, in the person of its bonding agent and attorney-in-fact, David Levitt of Levitt Fuirst Associates, Ltd., did consent to this change order and to the extension of the bond to cover the change order.

Mr. Levitt testified that it was his clear understanding that the change order was covered by the bond and that he, in the role of the bonding agent and attorney-in-fact of Contractors in regard to this bond, communicated with Sea Crest on that issue and would have presented that same understanding to its representatives. This testimony was confirmed by Mr. Trapp of Sea Crest who testified that Mr. Levitt had, in fact, so assured him in a telephone conversation on the subject. Contractors argues in part that Mr. Trapp's testimony about this conversation is inadmissible hearsay since Mr. Levitt is not an agent of Contractors. I disagree with this characterization of Mr. Levitt and have determined that he was, in fact, an agent at that time.

Moreover, the point is irrelevant because Mr. Levitt himself testified that he had spoken with a representative of Sea Crest and would have presented to that representative the same understanding of coverage that he expressed in his letter to Contractors. This understanding is also confirmed by a letter to Kim D'Oliveira of Contractors, written by Mr. Levitt and dated November 6, 1996, in which he informed Contractors of Sea Crest's request for a consent letter about a change order and then said "I do not believe any letter is necessary since whatever changes occur on the job would be automatically covered by the bond unless you would like me to get more detailed information as to what is involved in this $250,000.00. Please review and advise." That consent letter is found at Exhibit 219.

█ It is undisputed that neither Ms. D'Oliveira nor anyone else at Contractors ever contradicted the understanding expressed in this letter and in Mr. Levitt's communications to Sea Crest, despite the fact that Sea Crest had clearly made a special effort to confirm the validity of the change order. While Ms. D'Oliveira claimed that Mr. Levitt had no authority to make such an assurance, her basis for making that claim was a document called a "producer agreement" with Levitt Fuirst, which actually limits only Mr. Levitt's ability to issue new bonds, not his ability to make representations about change orders. In addition, it is undisputed that the document containing even this limitation was never sent to Sea Crest. There was therefore no basis for Sea Crest to question Mr. Levitt's authority, whether it was actual or apparent, to approve or relay approval of the change orders.

█ The law of agency is clear "that a principal is liable to third parties for the acts of an agent operating within the scope of his [or her] real or apparent authority," *Citibank N.A. v. Nyland (CF8), Ltd.*, 878 F.2d 620, 623–24 (2nd Cir.1989), and an undisclosed limitation of an agent's authority, even if it refers to the correct kind of authority, is not binding on unwitting third parties who are ignorant of that limitation. *See General Motors Acceptance Corporation v. Finnegan,* 156 Misc.2d 253, 592 N.Y.S.2d 570 (N.Y.Sup. 1992).

Furthermore, both Mr. Levitt and Paul Davis, the former bond underwriter for Contractors, testified that in general an approval is not necessary for an alteration such as this blasting change order. During the testimony of these witnesses, Contractors was able to raise some question in the minds of the witnesses about whether there would automatically be coverage at a different location or under a different contract, but the vague descriptions of other circumstances contained in those questions do not accurately reflect the fact pattern in this case. This understanding is confirmed by Mr. Levitt's October 17, 1996, letter to Sovereign, found at Exhibit 218, informing Sovereign that in regard to the "Family Housing West Point job if there are any additional work orders and/or extras" there will be an extra charge, but "since it is construed that this is all part of the original contract, it therefore becomes part of the work being bonded."

Moreover, the performance bond itself specifically waives notice to the surety of any alteration made by the owner. In light of all these facts, I do not credit Contractors' argument that the coverage under this change order was obtained without its consent and that its obligations under the bond are therefore void.

█ Contractors also fails to convince me that this change order constituted a material alteration. It argues, for example, that the different location of this portion of the demolition work, that is, at West Point rather than the Stewart Army Subpost, clearly constituted a material change in its obligations. However, the performance bond on its face covers the entire contract for "Family Housing, West Point, New York, Contract DACA 65–95–C–0098," and that is the project under which this additional work was undertaken, which always had as its primary purpose the construction at West Point.

Moreover, it is undisputed that no representative of Contractors ever read the Sovereign subcontract prior to execution of the bond, and so it cannot seriously be argued that Contractors was relying on the particular location of the rest of Sovereign's work as a material basis of its decision to enter into the bond itself. In fact, there is no reason to think that Contractors had any idea that the first phase of Sovereign's work was *not* being done at West Point, because that was the location identified on the face of the bond. Contractors raised no concerns about the first phase of the work being done away from the named location, even when they became aware that the work was being done at Stewart. If anything, the extra demolition work performed at West Point under the change order fell even more literally within the facial terms of the contract than the Stewart work did. Thus, contractors' argument that it relied on the location of the work, to its detriment, is without merit.

In sum, there is no basis for concluding, as Contractors claims, that the inclusion of the

change order in the bond constituted a material alteration of the surety's obligations, obtained without the consent of the surety, that would serve to discharge Contractors from its obligations.

*Section 3: The Amounts Owed Under the Bond.*

As I've noted, the performance bond requires Contractors to "make available as work progresses sufficient funds to pay the cost of completion less the balance of the contract price. The term 'balance of the contract price' as used in this paragraph shall mean the total amount payable by Sea Crest to Sovereign under the contract and any amendments thereto less the amount properly paid by Sea Crest to Sovereign."

The clear intention of the bond provision is that if Sovereign defaults, Contractors should be responsible for the excess, if any, of the cost of completion, over and above the costs specified in the original contract price plus any amendments to that original contract. In addition to disputing its liability at all, Contractors disputes Sea Crest's determinations of both the cost of completion and the balance of the contract price.

I will first address the principles to be applied to the calculations and then will present my findings of fact as to the proper calculations of the amounts in issue. First, as to the portion of the bond referring to the total amount payable by Sea Crest to Sovereign under the contract and any amendments thereto, Sea Crest submitted evidence, including the Sovereign contract, that its original contract price with Sovereign was $850,000.00. In addition, the parties do not dispute that the change order work at the West Point site added another $273,059.00 to that price, for a total of $1,123,059.00 as the amended contract price.

Second, I will address the portion of the bond which refers to the amount properly paid by Sea Crest to Sovereign. To determine the amount properly paid by Sea Crest to Sovereign, I have found that Sea Crest paid Sovereign $773,739.00 of the money owed to it for work at both the Stewart and West Point locations, consisting of $540,336.00 for work at Stewart and $223,403.00 for work at West Point. Sea Crest retained $13,653.00 in retainage from payments to Sovereign for the work at West Point, as permitted under Paragraph 14 of the contract, and also withheld payments due to Sovereign for the West Point work in the amount of $26,003.00.

To the extent that Sea Crest claims that that amount was slightly higher-that is, $27,372.00, which is the amount listed on its summary of damages at Exhibit 238 and was also the amount offered during testimony-my calculations, as well as those of Contractors set forth at Footnote 3, Page 11 of Contractors' reply memorandum, are slightly lower and are based on Exhibit 66, which shows the billings and payments. Thus, that withheld payment is $26,003.00, not $27,372.00. This number represents amounts that have been approved for payment but were never actually paid. Additionally, Sea Crest retained $28,459.00 for the work at Stewart, also as permitted by the Contract.

Sea Crest asserted in its trial testimony, and again in its post-trial submissions, that all retainage and withheld payments belong to Sovereign, and were being held for the account of Sovereign, and thus formed part of the cost of completion or the "amount properly paid". Thus, the amount properly paid, if one accepts Sea Crest's argument that retainages and amounts withheld should be included within this figure, which I do, came to a total of $841,854.00. Therefore, the balance of the contract price, that is, the total amount payable less the amount properly paid, would come to $1,123,059.00 minus $841,854.00, or $281,205.00.

The third item to be calculated is the cost of completion. As to Sea Crest's cost of completion after Sovereign's default, it is undisputed that Sea Crest contracted with Building Matrix to complete Phase II of the Stewart part of the project for the sum of $500,000.00. In addition, Sea Crest undertook to perform certain other Phase II work that should have been performed by Sovereign, for an estimated projected cost of $143,138.00, consisting of $118,296.00 in actual costs plus ten percent overhead and ten per-

cent of that total for profit. These two sums together total $643,138.00.

Sea Crest reported additional total payments of $132,205.33, consisting of payments to Van Dyk and Thompson Ridge Contractors for top soil, seeding and related work, plus labor costs undertaken by Sea Crest in connection with the completion of that seeding work. In all, these completion sums presented at trial amount to a total of $775,343.33.

Thus, the amount owed by Contractors, which is the cost of completion less the balance of the contract price, was, at the end of trial, $775,343.33 minus $281,205.00, or $494,138.33. Subsequently, Sea Crest submitted to the Court an affidavit from its contract manager, Damon DiSimone, dated November 9, 1998, attesting to, first, a subsequent reduction in the total cost of the Building Matrix contract and, second, a detailed accounting of the completion work performed by Sea Crest and the cost of that work. The affidavit also states that almost all of the work had been completed as of that date and only a small amount remained to be done at that time, which was just four days ago as of the date of this decision and order.

Counsel for Contractors has argued that the Court should not consider this post-trial submission, which has not been the subject of discovery or cross-examination. If I were to comply with Contractors' request and disregard this submission, the result of such a decision would be to deprive Contractors of an additional $105,669.69, which, as will be stated further in this opinion, would be the additional amount to be placed on deposit until work on the entire original subcontract between Sea Crest and Sovereign had been completed. That money, which presumably would never be paid out, would revert back to Contractors. I see absolutely no value in disregarding a sworn statement made by a person whose connection with Sea Crest means that the statement is not in his financial interest. Moreover, this affidavit simply specifies the results of a change order process that was testified to at trial.

To that end, I credit Mr. DiSimone's affidavit and I decline to order the reopening of discovery or the taking of further testimony on these issues. I note further that one part of the affidavit, regarding a credit to Building Matrix of $9,220.00, simply provides an exact figure, where at trial Mr. DiSimone testified that the amount of the credit was around $9,200.00. Of course, if Contractors' review of the supporting documents which have today been provided reveals any flaw in the calculations, an appropriate application can be made for a revision of any figures I have relied upon herein, and any overage would then be refunded to Contractors.

Mr. DiSimone stated that the value of the Building Matrix contract was reduced based on two recalculations. First, it was reduced by $28,500.00 to reflect the fact that the amount of duct asbestos actually present in the Phase II buildings, and therefore the amount that Building Matrix had to actually remove, was substantially less than was estimated in the original projections that formed the basis of the contract with Building Matrix. Second, it was reduced by an additional $9,220.00 to reflect the fact that Sea Crest had actually installed a temporary truck turnaround that was originally included within the scope of Building Matrix's work under the contract. Thus, Mr. DiSimone stated that the revised value of the Building Matrix completion contract is $462,280.00, rather than the $500,000.00 originally contemplated by the contract.

In addition, Sea Crest revised downward its own estimated completion costs for Phase II of the Stewart project. Mr. DiSimone stated, and provided me with a supporting breakdown of costs to establish, that Sea Crest's costs for work actually performed at the Wherry project by Sea Crest to date for completion of Phase II had amounted to $50,398.34. He also estimated that Sea Crest will incur an additional $24,790.00 in costs to complete the remaining work under the Sovereign subcontract. That latter estimated amount does not appear to include a claim for overhead and profits.

Mr. DiSimone calculated that these savings constituted a reduction, in total, of $105,669.66 from the damages estimate submitted at trial. He asserted that this reduced the total damages exclusive of legal fees to $389,-

837.67, although I calculate this final figure, which represents the excess of the cost of completion over the balance of the original contract price, as $389,468.67, of which the great bulk constitutes expenses already incurred. Of this amount, $24,790.00 represents the estimated future costs of Sea Crest's remaining work. A small amount of the Building Matrix contract also apparently remains to be completed, but there has been no evidence presented to suggest that the fixed contract price will vary.

Contractors argues that it is not required to make payments for estimated costs which have not yet been incurred by Sea Crest. It appears to be arguing that Sea Crest's calculations of the completion costs of the contract are not to be credited because Sea Crest "failed to present evidence of actual costs incurred in the completion of Phase II," that is, that it failed to introduce into evidence its records of such actual costs.

By this argument, Contractors appears to be suggesting that if no records of actual payments to, or at least payment requests from, Building Matrix were submitted at trial, then Sea Crest has failed to present evidence of its costs. Sea Crest's representatives testified at trial that Sea Crest had not yet received requests for payment from Building Matrix. Contractors appears to argue that, therefore, Sea Crest has not met its burden of proof as to damages.

■ This argument, however, while it certainly carries some weight in regard to those elements of Sea Crest's costs that are relatively speculative, are based entirely on future estimates, and are subject to final correction if those estimates are wrong, does not require the Court to withhold all decision as to damages on this matter until all final payment receipts have been compiled. This is particularly true since the most recent affidavit submitted by Sea Crest asserts that Building Matrix's work on the project is nearly completed, suggesting that any changes in the contract price at this point would be de minimis.

In regard to the contract price between Building Matrix and Sea Crest, while any actual change orders that reduce the contract price must be reported to the Court and a

credit applied to the damage calculation, the contract price agreed to between Sea Crest and Building Matrix is, especially in light of the near-complete status of the work and the adjustments already agreed to in the contract price, sufficient evidence of Sea Crest's reasonable completion cost in regard to those damages which the Court can determine with enough certainty to set up a structure now to pay those damages, while retaining the ability to refund any ultimate reductions in price to Contractors. *See McKegney v. Illinois Surety Company*, 180 A.D. 507, 508–09, 167 N.Y.S. 843 (N.Y. 1st Dep't 1917). In that case, a plaintiff who was entitled to the excess of cost of completion over the original contract price did not have to prove item by item the work left undone and the reasonable value of completing each item of work. Proof of making a contract to complete the unfinished work, and of the amount paid under it by the plaintiff, was competent to establish prima facie the plaintiff's claim in this regard.

Similarly, in regard to the completion work already performed by Sea Crest and the remaining work scheduled to be performed by it in upcoming months, the amounts at issue are at this point definite enough to be made the basis of a remedy that ultimately costs Contractors no more than the cost figures actually substantiated by Sea Crest. I note that even in the lead case submitted by Contractors to support its claim that completion costs must be substantiated, the Court held only that "The actual cost of completion *when available* " is preferable to an expert's opinion, and the Court actually allowed calculations of completion costs to be based on "amounts due" under existing subcontracts rather than on payments made, and on "issued and pending" change orders in addition to payments made to that date. *See George A. Fuller Company v. Kensington Johnson Corporation*, 234 A.D.2d 265, 267, 650 N.Y.S.2d 779 (N.Y. 2nd Dept.1996) (emphasis added).

Thus, I will determine today an amount of money representing a reasonable calculation of damages to be paid by Contractors to cover the excess of the completion cost over the original contract price, and will direct

that that money be placed by Contractors into an account to be maintained by the Clerk of the Court, referred to as a CRIS account. As Sea Crest pays the cost of completion up to the balance of the contract price, it will submit to the Court evidence of such payments. If, in fact, evidence of such payments is contained in what was submitted today, I will ask counsel to identify that in a subsequent submission to the Court, so that the Court is aware of precisely what it is that Sea Crest is alleging has been paid under the contract, up to the completion of the contract price, using the figures that I've given you today.

When Sea Crest has paid out that remaining balance of the original contract price, all additional completion costs will-upon presentation of appropriate requisitions from Building Matrix and authority for payment by the owner if that's the appropriate proof, or upon presentation of a payment requisition and authorization for payment or other supporting documentation for work performed by Sea Crest-be paid out of the balance of the CRIS fund by an order to be issued by me. When all completion costs have been paid and the contract has been completed, Contractors will be entitled to a refund of any funds remaining in that account.

I make note that a CRIS account is an interest-bearing account, and for the most part the Clerk's costs of supervising that account are taken out of the interest that is earned on that account. If there is any remaining interest, that would also be returned to Contractors.

I conclude as a finding of fact that the costs, as I've modified them, that were calculated by Sea Crest are a fair and accurate statement of the cost of completion-that being $775,343.33--and of the balance of the contract price-that being $281,205.00--subject to, first, any reductions in the total estimated price that may be evidenced by Sea Crest's proofs of payment and requisition forms, and second, any credits or modifications that Contractors has proven should be applied.

I turn now to Contractors' arguments about such credits or modifications.

*A. Credit for money allegedly due to Sovereign for the asbestos change order submitted to the Government on Sovereign letterhead.*

In July of 1996, Sea Crest submitted a change order request to the Department of the Army asking for additional money to cover the cost of removing additional asbestos that neither the Army nor Sea Crest knew about at the time the original contract was entered into between those two parties. Sea Crest submitted, as documentation for the cost of the additional work, two letters on Sovereign letterhead attesting to an additional cost of $10,431.94 for opening up the walls to investigate the asbestos, and $71,460.08 for removing the asbestos. The Government granted the change order, increasing the amount of payment to Sea Crest by $93,-500.00, including Sea Crest's overhead and profit.

Contractors argues that this additional work was not included within the scope of Sovereign's original subcontract and that therefore Sovereign was entitled to additional compensation for this additional work, but never received such compensation. Contractors adds that this additional and unpaid compensation should be added to the "balance of the [sub]contract price," which under the bond constitutes a credit against Sea Crest's alleged completion costs. Contractors also argues that the entire change order request, including the use of Sovereign's letterhead, took place without Sovereign's knowledge, and was part of an effort by Sea Crest to obtain and keep the additional money for itself.

However, the testimony at trial contradicts Contractors' assertions in this regard. The evidence established that the removal of this additional asbestos was not part of Sea Crest's original contract with the Army. This was the substance of testimony not only from Mr. DiSimone of Sea Crest but also from Paul Franco of the Army Corps of Engineers. In addition, not only Mr. DiSimone but also Sovereign's own president, Anthony Frascone, testified that the original Sovereign subcontract *did* include within its scope the removal of this additional asbestos. Mr. Frascone testified that it was his own under-

standing that Sovereign was not entitled to, and did not expect, any of the additional payment to Sea Crest received under the change order.

I find that, as argued by Sea Crest, the need for the additional work was not apparent at the time Sea Crest entered into its contract with the Army, but was apparent at the time Sea Crest entered into the subcontract with Sovereign. Thus, Sovereign was instructed to, and did, prepare its own cost estimates to *include* this additional work. Since the amount was not yet certain, Sovereign was instructed to prepare a worst case scenario as the basis of its cost estimate. As a result, Sovereign's subcontract price did include the cost of the additional work, but it was necessary for Sea Crest to apply for a change order to obtain a rebate from the Army for the extra payment to Sovereign. I credit the testimony of Sea Crest's representatives that, in consultation with Sovereign, it prepared the change order requests based on reasonable estimates of the additional cost of the asbestos abatement work. I also credit their testimony, which was not contradicted by Mr. Frascone of Sovereign, that the letterhead upon which the letters were prepared were likely to have been provided by Mr. Frascone's secretary, and that the letters supporting the change order request were forwarded to Sovereign for signature, which signature was not forged by Sea Crest.

In sum, Sovereign was paid for this additional work in its original subcontract. No additional payment is due to them for it, and no additional unpaid sums should be added to the balance of the contract price to provide a credit to Contractors.

B. *Credit due for costs charged by Building Matrix to provide for surface drainage to prevent ponding of surface water, which was allegedly not a part of Sovereign's original subcontract.*

Contractors argues that the Building Matrix contract price is inflated because the scope of the work included within it exceeded that included within the Sovereign subcontract. In particular, Contractors asserts that the requirement in Rider C that Building Matrix must "provide for surface drainage to prevent ponding of surface water" was not part of Sovereign's subcontract work.

I disagree with this assertion. The U.S. Army Corps of Engineers request for proposals and specifications for this project provides, on Page AC–71 at Paragraph 1, "After demolition the successful offeror shall fill all excavations, including basement spaces, with select granular material compacted as required by the Geo Technical Report. The fill shall be graded to provide for at least six inches of top soil and seeding and to provide for surface drainage to existing storm water drainage features without ponding of surface water." See Exhibit 203. Clearly, this requirement calls for the prevention of surface water ponding.

Rider C to the Sovereign subcontract incorporates the requirements set forth on Page AC–71 of the Wherry Project specifications. Thus, I conclude that the prevention of the ponding of surface water was within the scope of the Sovereign subcontract, and Contractors' request to deduct the cost of this work from the completion cost is denied.

C. *Was Sovereign entitled to additional compensation for delay, thereby requiring that the initial contract price plus adjustments be adjusted upward by over $200,000.00, and that the unpaid balance of the contract be adjusted upward accordingly?*

Contractors argues that the failure of Sea Crest to complete the design of the Stony Lonesome II Project inordinately delayed Sovereign's performance of the work under its subcontract, and materially increased the cost of such work for Sovereign by over $200,000.00. It also argues that the delay in approving design plans was the fault of the Army and that Sea Crest was therefore obligated to submit to the Army a change order request asking that the Army pay an additional $202,500.00 to compensate Sovereign for its increased costs due to the delay.

Contractors further argues that because it was Sea Crest's obligation to obtain the additional compensation from the Army, and Sea Crest failed to do so, Sea Crest owes this

additional sum to Sovereign as part of the adjusted contract price. Finally, Contractors argues that this amount owed to Sovereign by Sea Crest raises the total amount payable to Sovereign by Sea Crest under the contract and that, therefore, the balance of the contract price payable by Sea Crest before Contractors' obligations are triggered is also raised by $200,000.00.

I find that Contractors has not established either that Sea Crest was responsible for any delay in completing the design of the project, or that the delay was so clearly the fault of the Army that Sea Crest was obligated under the subcontract to submit a change order supporting Sovereign's demand for additional compensation.

The subcontract at Rider C, and Pages AC–69 to AC–75 of the Army's specifications which are referenced therein, make clear that it was the responsibility of Sovereign to prepare the asbestos and lead abatement plans. The testimony of Mr. DiSimone at trial, as well as his memorandum of August 11, 1996, to Alan August, which is found at Exhibit 214, which detailed the shortcomings in Sovereign's submissions and the role of Sovereign in contributing to the delays, strongly suggests that it was Sovereign itself, and Sovereign's failure to submit satisfactory plans and to get a subcontractor in place at the specified times, that played a major role in causing the delays.

In his testimony, Mr. Frascone of Sovereign admitted that he had been involved in prior projects for the Government. Certainly he could not have assumed, or estimated his costs on the basis of an assumption, that the demolition work would begin immediately upon signing the contract and that the first abatement plan he submitted would be instantly approved. Putting aside the fact that Contractors has not satisfactorily established the level of damage to Sovereign that might be attributable to the delay, it has more fundamentally failed to meet its burden of proving that Sea Crest and/or the Army were the parties responsible for the delay, and that Sovereign therefore deserves additional compensation for its delay damages.

*D. Should the retainages and payments that Sea Crest withheld from Sovereign be deducted from the amount that Sea Crest is deemed to have paid to Sovereign, and be included instead in the "balance of the contract price," which Sea Crest is required to pay out in its entirety before Contractors' payment obligation is triggered?*

Sea Crest asserts that the funds it retained from Sovereign, consisting of both the formally specified retainages and also the funds withheld from payments due, belong to Sovereign and, therefore, are part of the "amount properly paid" by Sea Crest to Sovereign, and are part of Sea Crest's completion cost.

Contractors asserts that these funds do not belong to Sovereign, that they have not been paid by Sea Crest as part of its completion costs, and that they should be credited to Contractors in the sense of being calculated as part of the unpaid balance of the contract price that Sea Crest is still obligated to pay, not as part of the amount already paid.

In support of its argument, Contractors argues that, by virtue of its issuance of the bonds, it is subrogated to all rights of the obligee Sea Crest to utilize the contract balance for project costs, and it is, therefore, subrogated to the rights of Sea Crest to withhold the payments and apply them to the contract balance. Contractors argues that its subrogation rights in the remaining contract proceeds apply regardless of whether it performed by completing the contract or simply paid out the claims.

However, as Sea Crest has pointed out, Contractors has done neither of those things. It has not performed under the performance bond, and it is before me in this action engaging in extensive and vigorous litigation for the purpose of avoiding all of its obligation to perform and all of its obligation to pay.

◼ As the New York Court of Appeals stated in *Pittsburgh–Westmoreland Coal Company v. Kerr,* 220 N.Y. 137, 143, 115 N.E. 465 (1917), "The right of subrogation or of equitable assignment is not founded upon

contract nor upon the absence of contract, but is founded upon the facts and circumstances of a particular case and upon principles of natural justice, and generally where it is equitable that a person furnishing money to pay a debt should be substituted for the creditor or in place of a creditor, such person will be so substituted... Equity would clothe the party thus paying with the legal garb with which the contract he has discharged was invested, and it would substitute the party paying to every equitable interest and purpose, in the place of the creditor whose debt he has discharged."

█ While Contractors did on the eve of trial settle with a single claimant under the payment bond, it has yet to pay out a penny, or step in in any other way, in regard to its obligations under the performance bond which is the subject of this action. Under New York law, a surety's right of subrogation "becomes available when the surety company completes the work at a loss." *See United States Fidelity & Guaranty Co. v. Triborough Bridge Authority*, 297 N.Y. 31, 36, 74 N.E.2d 226 (1947). This Contractors has not done.

█ In addition, even where subrogation of the surety to the rights of the obligee is proper, the Supreme Court has held that "[A]project owner's right [or in this case, the primary contractor's right] to setoff monies owed to the debtor against monies the debtor owes to the [primary contractor] is superior to the surety's right of subrogation and entitlement to the retainage." *In re QC Piping Installations Inc.*, 225 B.R. 553, 563 (Bankr. E.D.N.Y., 1998) (citing *United States v. Munsey Trust Co.*, 332 U.S. 234, 108 Ct.Cl. 765, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947)).

In this case, Sea Crest asserts what it describes as an equitable claim to these funds that is superior to the claim of Contractors. The Sovereign subcontract provides that Sea Crest is entitled to collect counsel fees from Sovereign under certain circumstances, such as where there has been a failure by Sovereign to prosecute the work with reasonable diligence and Sea Crest has stepped in to complete the work. The subcontract holds that all expenses in connection with the completion of such work, including reasonable counsel fees, shall be deducted from the amount due or to become due to the subcontractor. *See* Subcontract at Paragraph 10.

█ To the extent that I find that Sea Crest is not entitled to reimbursement of attorneys' fees from Contractors, Sea Crest may choose to assert a claim for attorneys' fees against Sovereign out of these unpaid or retained sums, and the proper forum for doing so as I will note in a moment, would be in the Bankruptcy Court where Sovereign is a party.

█ In addition, it is clear to me that under Section 541 of the Bankruptcy Code, found at Title 11 of the United States Code, and subsequent case law, I must treat these retained funds, at least for purposes of this action, as property of the estate of the debtor Sovereign. *See In re Nemko, Inc.*, 143 B.R. 980 (Bkrtcy.E.D.N.Y.1992) (Duberstein, Chief Judge).

█ In that case, an admitted liability owed to the debtor, such as funds owed by a prime contractor or owner for work completed under a contract, is property of the estate even where the contract gives the prime contractor the right to delay payment pending the outcome of claims against it.**

** Neither party has cited to either *QC Piping* or *In re Nemko*. *Nemko*, as noted here, holds that amounts owed to a debtor for work completed pursuant to a contract constitute property of the estate despite any contractual right of the party for whom the debtor has been working to delay payment. To the extent that *QC Piping* departs from this holding, it is distinguishable on numerous grounds, including the fact that the surety in that case had already performed in full, that the performance was in response to a pre-petition default, that the project owner, unlike Sea Crest,

had not waived its right to retain the funds, and that the project owner was fully willing to pay the retained funds to the surety, since the surety had completed the work and there were no other claims, including any claims of the project owner, against the retained monies.

It is also noteworthy that it was the Bankruptcy Court that made all determinations on this issue in *QC Piping*, and that the debtor was a party to the action and was therefore able to assert its own right to the funds.

In this case, Sea Crest has admitted that it owes this liability to Sovereign. Even if one were to argue that Sea Crest had the contractual right to contest this point, based on a failure by Sovereign to fulfill the conditions precedent to releasing the money, a condition in a contract may be waived when that condition is solely for the benefit of the party choosing to waive it.

I also conclude, and direct accordingly, that Sea Crest must pay these funds, which it admits belong to Sovereign, in the amount of $68,115.00, made up of $13,653.00 of West Point retainage, $26,003.00 of withheld payment, and $28,459.00 of Stewart retainage, into the debtor's estate. However, I will stay that order of payment of those funds for a period of 45 days, to allow Sea Crest sufficient time to intervene in the bankruptcy proceeding, by commencing an adversary proceeding or requesting the lifting of the automatic stay, to permit it to go forward with any claims for reimbursement of attorneys' fees that it may have against Sovereign and against these funds in particular. During that time, Sea Crest must retain these funds in a secure fashion.

I also order that Sea Crest notify the office of the Bankruptcy Trustee of the contents of this decision, and specifically of this portion of the decision, and notify counsel for Sovereign on Sovereign's bankruptcy of this decision and the pendency of the payment to Sovereign, and that such notification must be made within five business days of the filing of the transcript of this decision.

Upon such notification, the Bankruptcy Trustee or the debtor's attorney may identify where such deposit of those funds on behalf of the debtor's estate is to be made, and releasing this money in accordance with an order of the Bankruptcy Court or the Bankruptcy Trustee will comply with this decision. In the event that no such order is received by the end of the 45 day stay, the money is to be paid to Sovereign with an additional notice of such payment to be made to the Bankruptcy Trustee and to Sovereign's counsel.

Certainly, Contractors may upon the payment of those funds into the Bankruptcy Court, or upon the commencement of any action in Bankruptcy Court by Sea Crest, intervene to assert its rights with regard to those funds, including any claims of subrogation that may accrue to Contractors as a result of the payment it may make in the future under the performance bond. *See, e.g., QC Piping,* 225 B.R. at 566.

It is clear to me in this case, where there is a significant dispute about which party is entitled to all or a portion of these funds, that it is the province of the Bankruptcy Court to make such a determination about rights to the disputed funds, which have been up to now withheld from the debtor, and to which the debtor, I find, has at least a colorable claim. I conclude, therefore, that it is most appropriate for this Court to treat the funds withheld from Sovereign as property of the debtor's estate, and to include them within the completion costs as an amount properly paid by Sea Crest to Sovereign. The issue of whether Contractors ultimately may be granted certain subrogation rights to any portion of the funds as reimbursement for expenses it has already paid is an issue that can be determined by the Bankruptcy Court.

E. *Should the amount of money damages owed by contractors be reduced because some of Sea Crest's completion expense was caused by Sea Crest's failure to mitigate?*

Contractors argues that Sea Crest failed to fulfill its obligation to mitigate damages in a number of different ways. First, Contractors points to the "stop notice" letter sent to Sea Crest in February of 1997 asking that Sea Crest not pay any further funds directly to Sovereign because of Am–Haul's claim of non-payment, and to another similar letter it sent to Sea Crest on May 12th. However, Contractors does not identify any further payments that were allegedly made by Sea Crest to Sovereign in violation of these notices and that, therefore, resulted in damage to Contractors.

In fact, there is evidence in the record in the form of a faxed letter from Larry Trapp of Sea Crest to Sovereign on May 29, 1997, that Sea Crest complied with the terms of the stop notice and made no further pay-

ments to Sovereign. In addition, Contractors submitted into evidence a copy of an April 22, 1997, pre-default letter from Sea Crest to Sovereign, and Contractors points out that its May 12th letter also asked for more details about that potential default, and asked Sea Crest to confirm or deny Sovereign's statement that the potential default threat had been satisfactorily resolved.

Sea Crest did not respond to that letter, but now counters that Sovereign's statement to Contractors was, in fact, correct, that the issue had been resolved, that there was no potential default situation in existence at that time, and that therefore there was no damage to Contractors from Sea Crest's failure to respond. Moreover, in response to Contractors' assertion that Sea Crest's failure to respond to the May 12th letter prevented Contractors from "ascertaining the status of Sovereign's performance under the subcontract and arranging for the completion of the subcontract at the least possible cost," *see* Contractors' Post–Trial Memorandum of Law at 34, Sea Crest correctly points out that there was no default by Sovereign at that time, and that no claim had been asserted by Sea Crest under the bond, so Contractors could not have made any arrangements for completion of the subcontract. Thus, no identifiable damage ensued from Sea Crest's failure to respond to that letter.

When, almost four months later, Sea Crest did declare Sovereign in pre-default on August 27th, and then declared it in default on September 5th, and also notified Contractors of those actions, Contractors did not respond to the default letters at all. It was only on December 16, 1997 that Sovereign responded—after Am–Haul had commenced this litigation, and after Contractors received a December 2nd letter from Sea Crest alleging costs of approximately $108,000.00 due to Sovereign's default, for which Contractors was alleged to be responsible under the bond. However, the letter that Contractors then sent to Sea Crest, requesting that Sea Crest forward certain documents relating to the default, was actually sent by Contractors' counsel, and because this litigation had already commenced, that letter was forward by Sea Crest to its own counsel—a step that was perfectly reasonable given the fact that both parties were defendants in this action, that Sea Crest was represented by counsel, and that there was certainly the potential, as future developments would prove, for a divergence in the interests of the two parties.

While Contractors argues that Sea Crest should have been more forthcoming in its document productions after that date, this claim does not support an allegation that Sea Crest violated a covenant of good faith or that Sea Crest's behavior prevented Contractors from obtaining the information it needed to perform on the bond. It is clear that time was of the essence in this contract, not only because there is a clause to that effect in Paragraph 6 of the subcontract, but also by the terms of Paragraph 10, which allowed Sea Crest to enter upon the premises and undertake completion of the work within just 48 hours of notification to Sovereign of default or other similar conditions.

 Contractors is charged with knowledge of the specific terms of this subcontract, which is incorporated by reference in the performance bond, yet it delayed any response to the default notice or any request for information until three and one-half months after notification of default. Contractors cannot then be heard to complain that it was Sea Crest's subsequent delay that prevented it from performing. It was clear that Sea Crest was under time obligations to the Army and that Contractors, if it wished to participate in completing the work as it was obligated under its bond to do, was obligated to immediately initiate contact with Sea Crest, and if necessary to go to the construction site to determine the status of the project and to begin taking its corrective steps or making funds available to complete the contract.

 Contractors does not claim that it was prevented from visiting the site in the months before the Am–Haul litigation was commenced, and to the extent it is relevant, I do not credit its assertions that Sea Crest made it impossible for Contractors to perform such a visit for the entire time period following initiation of the lawsuit. Having failed to take any steps to fulfill its obligation in a timely fashion, Contractors cannot put

the blame on Sea Crest for failing to mitigate damages. I note that in the vast majority of contractor-surety cases cited herein and reviewed in the preparation of this decision, the surety had, in fact, promptly stepped into the contractor's shoes and undertaken its obligations under its bond.

■ Contractors' failure in this case to undertake its obligation in a similar fashion has resulted in this costly litigation, and while I do not conclude that it constitutes bad faith on Contractors' part, it is far from the diligent performance on the bond that Sea Crest was entitled to. It is simply not the case that a surety may await the completion of a project before it offers financial support. Notwithstanding Contractors' apparent belief that it had no obligation until completion of the project, both the bond and the subcontract incorporated therein clearly required Contractors to step in immediately upon notice of default by Sovereign. This it did not do. It cannot now benefit from its own failure.

In addition, the only example of excessive payment that Contractors has identified concerns the payment of funds to Thompson Ridge, a landscaping subcontractor which delivered top soil and hydroseeding supplies to the project over the summer, and which is alleged by Contractors to have provided substandard performance. The parties dispute whether Thompson Ridge simply delivered supplies or also was responsible for completing seeding work. They agree that the end result of the landscaping work was a tangle of weeds rather than a satisfactory lawn of grass.

The parties also dispute whether it was Thompson or Sovereign that was responsible for overseeing the successful watering and upkeep of this landscaping job, procedures which were necessary to the success of the landscaping project. Contractors alleges that Thompson failed to perform and that Sea Crest was notified of this failure in sufficient time to avoid payment for the unsatisfactory work, yet paid anyway.

■ Sea Crest counters that it was Sovereign that failed to perform, and that in any case Sea Crest did not receive notice of any

complaint against Thompson Ridge until it was too late to stop payment. I cannot say that either side has submitted sufficient evidence on this issue to prove its position by a preponderance of the evidence; since the burden is on Contractors to prove by a preponderance of the evidence that Sea Crest failed to mitigate its damages, I find that Contractors has failed to meet its burden in this regard.

■ Contractors also alleges that the decision between Sea Crest and Sovereign to reduce retainages from the ten percent specified in the subcontract to five percent also represents a failure by Sea Crest to mitigate. However, Contractors' attorney-in-fact and bond agent, David Levitt, testified, and no one representing Contractors disputed, that Contractors, while legally chargeable with knowledge of the subcontract, had never actually read it before it entered into the bond agreement, and therefore it could not have relied on the ten percent retainage specified therein when it issued the bond. Indeed, Paul Davis, who authorized the issuance of the bond, admitted that he did not see the subcontract before authorizing the bond.

In addition, as I have noted above, Contractors waived notice of any alterations of the subcontract. Therefore, it cannot be said that Sea Crest was obligated to Contractors to retain ten percent rather than five percent, or that any agreement by the parties to reduce the retainage prejudiced Contractors. This is particularly true in light of my finding that the retainages belonged to the debtor's estate and should be counted as sums properly paid under the contract, but it would be true even in the absence of that finding.

Thus, I conclude that the total amount of money to be deposited by Contractors, as stated herein, to the Clerk of the Court, is $389,468.67, said money to be deposited within ten business days of the filing of the transcript of this oral decision.

*Section 4: Legal Fees*

■ With regard to legal fees, Sea Crest also claims that it is entitled to legal fees from Contractors covering both its fees for defending the action against Am–Haul and

its fees for cross-claims against Contractors under the performance bond. Contractors claims that it is responsible for neither. The payment bond at Paragraph 2 states that "Sovereign and Contractors hereby jointly and severally agree with the owner that every claimant who has not been paid in full before the expiration of a specified period may sue on this bond for use of such claimant, prosecute the suit to final judgment for such sum or sums as may be justly due claimant, and have execution thereon. The owner [in this case Sea Crest] shall not be liable for the payment of any costs or expenses of any such suit." Am–Haul, a claimant under the bond, sued both Contractors and Sea Crest. As a result of Contractors' decision to launch a vigorous defense to free itself not just from any obligations to Am–Haul but also from any obligations to Sea Crest under the bond, and its refusal until the eve of trial to acknowledge any obligation to Am–Haul or to Sea Crest, Sea Crest was forced to interpose a defense to Am–Haul's claims in the action, and to incur legal fees and expenses in that defense.

The question is whether the final sentence of this paragraph from the payment bond means that Sea Crest shall not be liable for the payment of attorneys' fees incurred in defending such a suit. It would have been clearer to me that that was the intent of the parties if the contract had specified that attorneys' fees were included in the definition of expenses. See, for example, *Montgomery–Otsego–Schoharie Solid Waste Management Authority v. Otsego*, 249 A.D.2d 702, 671 N.Y.S.2d 545, 547 (3rd Dep't 1998), where the parties specified that the defaulting party agreed to pay all out-of-pocket expenses of the non-defaulting party including reasonable fees and expenses of its counsel.

■ However, the parties in this case were not so clear, and it is up to me to construe the terms of the agreement. "The contracts of sureties are to be construed like other contracts so as to give effect to the intention of the parties. In ascertaining that intention, we are to read the language used by the parties in the light of the circumstances surrounding the execution of the instrument." *Davis Acoustical Corporation v. Hanover Insurance Company*, 22 A.D.2d 843, 254 N.Y.S.2d 14 (3rd Dep't 1964).

■ However, "while narrowly construing the language of such a bond, the Court must also consider the reason for which it was procured. As the Court of Appeals has held, to cull from the bond its true meaning and intention it must be read in its entirety, and the purpose and effect of the bond as a whole must be considered." *DuBois v. City of New York*, New York Law Journal, December 9, 1996 at 25, Kings County Supreme Court (quoting *McClare v. Massachusetts Bonding & Insurance Company*, 266 N.Y. 371, 377, 195 N.E. 15 (1935)).

In terms of the actual wording of this contract, I note that it covers not just "costs", but also the "expenses" of any suit, and the term "expenses of litigation", unlike the term costs, is often used interchangeably with attorneys' fees. *See, e.g., Mighty Midgets Inc. v. Centennial Insurance Company*, 47 N.Y.2d 12, 416 N.Y.S.2d 559, 389 N.E.2d 1080 (1979). The Mighty Midgets Court clarifies early in the decision that it is addressing the issue of whether the insurer is liable for attorneys' fees and disbursements, but then refers later in the case to the lower court's deletion of the award for "fees and expenses", and finally refers to the lower court's striking of the award for "the expense" to which it was put in bringing this action. *See also Aero Garage Corporation v. Hirschfeld*, 185 A.D.2d 775, 586 N.Y.S.2d 611, 612 (1st Dep't 1992)(referring to attorneys' fees as legal expenses).

Moving on to look at the purpose and effect of the bond as a whole, it is clear that the overall purpose of this bond was to protect Sea Crest from having to incur any costs based on claims of non-payment made by Sovereign's subcontractors, and the bond went so far as to specifically protect Sea Crest not only against monetary claims, but also against any liability for the payment of any costs or expenses of any suit that the contract specified such claimants might bring. In most actions it is the legal fees that form the greatest bulk of such expenses. It would be hard to believe that the intent of the parties in entering into the bond was only

to protect Sea Crest against other expenses, but not legal fees.

■ In addition, the law of New York states that even absent specific contractual authorization, attorneys' fees, which may not be had in an affirmative action brought by an assured to settle its rights, may be recovered when the assured has been cast in a defensive posture by the legal steps an insurer takes in an effort to free itself from its policy obligations. *Mighty Midgets*, 47 N.Y.2d at 21, 416 N.Y.S.2d 559, 389 N.E.2d 1080.

There is no question that Sea Crest was the intended beneficiary of this insurance bond. As Sea Crest points out, it was Contractors' legal steps taken in an effort to free itself from its policy obligations not just to Am–Haul, but also in several specific affirmative defenses from its obligations to Sea Crest, that created the need for Sea Crest to act in a defensive posture and to interpose a defense to Am–Haul's claims. Thus, while Sea Crest's affirmative claims against Contractors under the performance bond do not entitle it to recovery for attorneys' fees under this theory, its defensive actions brought on by Contractors' efforts to free itself of its policy obligations do qualify. This gives added support to the other factors that support a claim for legal fees: that is, the overall intent of the contract, the specific inclusion of the term expenses as opposed to simply costs in the contract, and the interchangeable use of the term expenses and attorneys' fees in the very Court of Appeals case that supports the principle of legal fees in this kind of situation.

Thus, I conclude that, under the payment bond, Sea Crest is entitled to recover all costs and expenses, including attorneys' fees, of the claims brought against it by Am–Haul, and to make such recovery against Contractors.

■ But unlike the payment bond, the performance bond does not contain any explicit provisions indemnifying Sea Crest against the cost or expenses of litigation. Although the terms of the Sovereign subcontract are incorporated by reference into the performance bond, the obligations of that subcontract are obviously not all incorporated into the obligations of Contractors. Rather, the obligations of Contractors are clearly spelled out on the face of the bond, and a surety is chargeable only according to the strict terms of its undertaking. *See Lynbrook Glass & Architectural Metals Corporation v. Elite Associates, Inc.*, 225 A.D.2d 525, 526, 638 N.Y.S.2d 622 (2nd Dep't 1996).

I find no grounds for holding Contractors liable for the legal fees incurred by Sea Crest in bringing its cross claims against Contractors, and that part of Sea Crest's application is denied.

I do note that to the degree that Sovereign was contractually obligated to indemnify Sea Crest against litigation expenses, Sea Crest may have a claim against the money that I have directed should be paid to the debtor's estate. That issue, however, as I have said, must be raised and considered in the Bankruptcy Court.

Thus, with regard to its claims for attorneys' fees, I direct Sea Crest to submit its claim for the portion of its fees, costs and expenses, only relating to its defense of Am–Haul's claims, within thirty days of the date of this order, which is December 14, 1998. Contractors may submit opposition to the specific amounts claimed no later than 21 days thereafter, or January 4, 1999, and Sea Crest's reply, if any, is due one week beyond that time, or January 11, 1999.

In conclusion, I hereby declare that I find Contractors to be in breach of its obligations under the performance bond. I direct that Contractors pay to the Clerk of the Court the sum of $389,468.67 in accordance with an order for placing funds in a CRIS fund-that is, a Court Registry Investment System fund-an order which will be entered today. The monies will then be disbursed in accordance with the terms of this decision and order. I hereby further direct that Sea Crest submit proof of its attorneys' fees in regard to its defense of the Am–Haul claim in accordance with this decision and order, and direct that Sea Crest deposit the monies previously withheld for the benefit of Sovereign in accordance with the terms of this decision and order.

The Clerk is to enter a judgment accordingly and the Clerk is to have this oral decision and order transcribed. The date upon which any right to appeal begins is the date of filing of that transcript. This constitutes the decision and order of this Court.